**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**Orlando Division**
**www.flmb.uscourts.gov**

**In re:**

                                **Chapter 11**

**GLOBAL ASSET RENTAL, LLC,**        **Case No. 6:20-bk-04126-KSJ**
  **f/k/a GLOBAL KEG RENTAL, LLC**

      **Debtor.**
_____/

**DECLARATION OF SONEET R. KAPILA, CHIEF RESTRUCTURING OFFICER, IN SUPPORT OF AN ORDER (I) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS, (II) APPROVING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND (III) GRANTING RELATED RELIEF**

SONEET R. KAPILA, Chief Restructuring Officer of Global Asset Rental, LLC f/k/a Global Keg Rental, LLC (the "Debtor") makes this Declaration pursuant to 28 U.S.C. § 1746, and states:

1. I am the founding partner of KapilaMukamal, LLP ("KM") which maintains offices at 1000 South Federal Hwy., Suite 200, Ft. Lauderdale, FL 33316. KM is a Florida accounting and consulting firm which specializes in, among other things, providing insolvency, turnaround, forensic and investigative consulting, and litigation support services to financially-troubled organizations.

2. The Debtor hired me as its Chief Restructuring Officer on July 17, 2020. The Bankruptcy Court approved my retention on an interim basis on August 7, 2020 [ECF No. 80] and on a final basis on August 20, 2020 [ECF No. 97]. As a result, I am authorized to submit this Declaration of behalf of the Debtor.

3. On August 19, 2020, the Debtor filed its *Emergency Motion For The Entry Of An*

*Order (1) Approving Competitive Bidding Procedures For The Sale Of Substantially All Of Debtor's Assets, (2) Scheduling Dates To Conduct Auction And Sale Hearing, (3) Approving The Form And Manner Of Notices, (4) Approving The Sale Of Substantially All Of The Debtor's Assets Free And Clear Of All Liens, Claims, Encumbrances And Interests, (5) Approving Assumption And Assignment Procedures, And (6) Granting Related Relief* (the "Sale Motion")[1] [ECF No. 93]. On August 27, 2020, the Bankruptcy Court entered its Order approving the Sale Motion as to the bid procedures, auction procedures and date, approving the form and manner of notices, assumption and assignment procedures and related relief (the "Bid Procedures Order") [ECF No. 116].

4. I submit this Declaration in support of an Order (I) Approving the Sale of Substantially All of the Debtor's Assets Free and Clear of All Liens, Claims, Encumbrances and Interests, (II) Approving Assumption and Assignment of Certain Executory Contracts and (III) Granting Related Relief. More specifically, I submit this Declaration in support of my opinion that entry by the Debtor into an Asset Purchase Agreement ("APA") with White Oak Global Advisors, LLC ("White Oak") or its designee International Keg, LLC (collectively, the "Proposed Purchaser" or "White Oak") is in the best interest of the estate and its creditors

5. Except as otherwise noted, all statements set forth in this declaration are based on (a) my personal knowledge, (b) my review of relevant documents, (c) information provided to me by KM employees working under my supervision, (d) information provided to me by, or discussions with, the Debtor and its professionals, and/or (e) my opinion based on my experience. If called to testify, I could and would testify to the facts and opinions set forth herein.

6. I am not being compensated specifically for this testimony other than through the payments in connection with my retention as the Debtor's Chief Restructuring Officer.

---

[1] All terms not otherwise defined herein have the meanings ascribed to them in the Sale Motion.

**Approval of the Proposed Purchaser's APA**

7. As with many other companies in the beer, restaurant and bar supply industry, the recent worldwide pandemic resulting from the spread of the Coronavirus (COVID-19) substantially and adversely affected the Debtor, its operations and its revenue. Due to the government ordered closure of bars and restaurants around the World, the supply chain in this industry was brought to an almost halt. The Debtor experienced a rapid and substantial plunge in rentals and revenues starting in March 2020. Rental volumes have been down 97% year over year for the last four months (April through July 2020). In addition, those bars and restaurants that have re-opened recently are primarily utilizing single use bottles and cans as opposed to kegs for serving beer, and due to the recent surge of COVID-19 cases, many states have reversed course on re-openings and have again closed down bars. Because the duration of the Coronavirus pandemic is unknown, the Debtor expects demand for its kegs and pallets to remain weaker than usual for the immediate and foreseeable future.

8. In order to maximize the value of its assets for the benefit of all stakeholders in this Chapter 11 case, the Debtor made the decision to proceed with the sale of all or substantially all of its assets (the "Assets") pursuant to Sections 363 and 365 of the Bankruptcy Code to the highest and best bidder. The Debtor believes that the highest and best value will be achieved through a sale of its Assets as a going concern in lieu of a piecemeal sale of individual assets which are spread throughout the World. The Proposed Purchaser proposes to acquire the Assets as a going concern.

9. The sale contemplated by the APA represents a prudent exercise of the Debtor's business judgment. The Debtor arrived at the decision to consummate the APA after extended consultation with its advisors, and the exploration of other potential restructuring possibilities.

Ultimately, it was determined that the APA provides the best outcome for the Debtor and all parties in interest, and that no other sale or restructuring alternative will provide more value to the Debtor's estate and parties in interest. Accordingly, based upon my experience with asset sales of this magnitude, the sale of the Assets to the Proposed Purchaser is in the best interests of the Debtor, its estate and all parties in interest, and I believe the Court should approve the sale as contemplated under the APA.

10. In addition, the APAs and the transaction contemplated under the APA, were negotiated in good faith and at arm's length. Both the Debtor and the Proposed Purchaser were represented by independent counsel before the Petition Date and during this chapter 11 case.

## Marketing Process

11. The marketing process that Debtor and its advisors undertook, as well as the bidding procedures entered by the Court and implemented by the Debtor and its advisors, have confirmed that the APA reflects the highest and best offer for the Assets, which importantly, includes the going-concern business of the Debtor, jobs for certain of its employees and a continued business source for many of the creditor stakeholders in this chapter 11 case.

12. Given my experience in marketing distressed businesses, familiarity with the Debtor's business and relationship with potential suitors, the Debtor determined that I, with the assistance of staff at KM, at my direction, manage the marketing and sale process for the Assets. Immediately after the Petition Date, we ("we" includes myself and KM staff, at my direction, for purposes of this portion of the Declaration) started compiling a data room with sights set on a fulsome marketing and sale process. On August 8, 2020, we sent out 65 marketing e-mails and confidentiality and non-disclosure ageeements ("NDAs") to potential strategic and institutional purchasers. Subsequent to the initial e-mail blast, we sent an additional 36 NDA's to interested parties. Nineteen NDA's were negotiated and returned signed, and in connection therewith we granted those parties access to the data room. Of those 19, 12 parties were actively involved in gathering information from the data room in order to evaluate the Debtor's business and assets

for sale. We worked directly with several of the potential purchasers to answer inquiries related to the Debtor's assets. As discussed in more detail below, of those parties that executed an NDA, three submitted Qualified Bids, including the credit bid the Debtor received from White Oak under the Bid Procedures Order.

13. I believe that the Assets were fairly and thoroughly marketed until and through the Bid Deadline. It is my opinion that further marketing would not reveal any other party interested in submitting an offer that would be higher and better than the APA (as may be amended) submitted by White Oak. In my opinion, as further discussed herein, White Oak's bid (as amended to accommodate the Settlement (as defined below)) represents the highest and best offer the Debtor received for the Assets.

## Assumed and Assigned Contracts

14. The APA requires, among other things, the Debtor to assume and assign certain executory contracts and/or unexpired leases to the Proposed Purchaser, which contracts are set forth in the APA (the "Assumed and Assigned Contracts"). The Assumed and Assigned Contracts are an integral part of the sale of the Acquired Assets, and their assumption and assignment is reasonable, necessary and provides an enhancement to the value of the Debtor's estate by increasing the value of the Assets, while reducing the number of potential rejection damage claims.

15. The APA provides for the payment of all Cure Amounts associated with the Assumed and Assigned Contracts by the Proposed Purchaser, and the Proposed Purchaser has demonstrated adequate assurance of future performance of all obligations under the Assumed and Assigned Contracts within the meaning of 365 of the Bankruptcy Code, as evidenced by the Proposed Purchaser's promise to perform the Debtor's obligations under the Assumed and Assigned Contracts for the periods on and after the closing of the sale of the Assets. Based on my review and understanding of the financial wherewithal of the Proposed Purchaser, I believe that

the Proposed Purchaser can quickly provide counterparties to the Assumed and Assigned Contracts with adequate assurance of future performance.

### The Auction and Settlement

16. Prior to the Bid Deadline,[2] the Debtor received Qualified Bids from White Oak, Keg Logistics LLC ("Keg Logistics") and Blefa GmBH ("Blefa"). The Debtor also received a bid from Ahrma Holding B.V. ("Ahrma"), which the Debtor, in consultation with the Committee, determined was not a Qualified Bid. The Debtor provided Ahrma with an opportunity to comply with the Bid Procedures Order, including extending the Bid Deadline therefore. Ahrma elected not to proceed.

17. White Oak submitted a credit bid in the amount of $15,000,000 for substantially all of the Debtor's assets and the Debtor's business as a going concern. Blefa and Keg Logistics each bid for certain assets and not the business as a going concern. Blefa's bid sought to acquire all of the Debtor's stainless steel beer kegs and required such kegs to be in "sufficient working condition" as opposed to a sale that was "as is and where is." Keg Logistics' bid sought to acquire the Debtor's kegs located in Canada and the United States. Each bid by Blefa and Keg Logistics also contained contingencies that the Debtor could not reasonably meet, including, but not limited to, the marshalling and delivery by the Debtor, at its cost, of the kegs to locations identified by Blefa or Keg Logistics, as applicable.

18. In light of the bids received from White Oak, Blefa and Keg Logistics, each of which was a Qualified Bid, and the fact there was at least some overlap among the various Qualified Bids, the Debtor notified parties in interest that the Auction would be conducted at 9:00

---

[2] The Bid Deadline of September 16, 2020 at 5:00 p.m. (prevailing Eastern Time) was extended to September 17, 2020 at 9:00 a.m. (prevailing Eastern Time) to allow proposed bidders additional time to prepare their bid packages.

a.m. (prevailing Eastern Time) on September 18, 2020. Notwithstanding the notification that an Auction would occur, the Debtor, the Proposed Purchaser and the Official Committee of Unsecured Creditors (the "Committee") thereafter engaged in discussions to resolve various issues and concerns raised by the Committee in its Motion of the Official Committee of Unsecured Creditors to Limit Credit Bids with Respect to the Sale of Substantially all Assets of the Debtor [ECF No. 143] and Objection of the Official Committee of Unsecured Creditors to Emergency Motion for Entry of an Order Approving the Sale of Substantially All of the Debtor's Assets [ECF No. 170] (collectively, the "Committee Objections").

19.    Prior to the Auction, negotiations between White Oak and the Committee ultimately resulted in a settlement, subject to documentation and Court approval, that will provide a recovery to unsecured creditors and provide the funding necessary to wind down the Debtor's estate and avoid administrative insolvency (the "Settlement"). The Settlement provides certainty for the Debtor and its creditor constituents. The Settlement provides an avenue for the Debtor to consummate the sale to the Proposed Purchaser, which alone saves the business, preserves jobs, and benefits all of the vendors and customers that do business with the Debtor. The Settlement also provides the means for the Debtor to wind down its estate, because the Settlement provides an appropriate level of funds in order to achieve confirmation of a liquidating plan, as well as provide recovery to creditors. With the Committee's support, the Settlement paves the way for the Debtor to resolve its bankruptcy case, while simultaneously preserving its business and jobs.

20.    The Debtor conducted the Auction[3] on September 18, 2020 at 9:00 a.m.. Twenty nine persons representing the Debtor, the Committee and the three Qualified Bidders attended via Zoom or teleconference from around the World. Prior to additional bidding, White Oak and the

---

[3] A transcript of the Auction was filed with the Court [ECF No. 177].

Committee announced the general terms of the Settlement (subject to final documents), including that White Oak would increase its credit bid to approximately $40-$50 million (exact amount to be determined), waive any distribution on its deficiency claim, and in settlement of the Committee's asserted litigation claims pay an amount equal to $1.25 million in cash to the estate and provide 10% of the recoveries from the Heineken Arbitration to the estate. Blefa and Keg Logistics declined to counter with any further bids and the Auction was concluded at 9:23 a.m.

## Conclusion

21.     I believe that White Oak's Qualified Bid, as modified at the Auction pursuant to the Settlement, subject to documentation and Court approval, is the highest and best offer the Debtor received for the Assets and should be approved.

22.     Without approval of the APA, after a few more weeks of operation, the Debtor will, quite simply, run out of cash. Without acquiring the additional working capital that will come with a new owner, all of the Debtor's employees would be let go soon thereafter and a conversion of this case to a case under chapter 7 would likely follow, leaving virtually no recovery for unsecured creditors.

23.     The APA, and subsequent orderly wind down of the Debtor's estate, will avoid the inevitable and immediate shut down of the Debtor's operations, because it provides for the going-concern operation of the business, allows the Debtor to meet required milestones in this case, paves the way to resolve the bankruptcy case and preserves jobs. It is my opinion that executing and consummating the transaction set forth in the APA is the only feasible avenue for the Debtor to maximize the Assets' value, save jobs, continue business operations and responsibly resolve the bankruptcy case

24.     This concludes my declaration.

## 28 U.S.C. § 1746 Declaration

I declare under penalty of perjury that the foregoing is true and correct. Executed on September 20th, 2020.

*[signature]*

SONEET R. KAPILA
Chief Restructuring Officer
Global Asset Rental, LLC