## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

|  |  |
|---|---|
| In re:<br>GLOBAL ASSET RENTAL, LLC f/k/a<br>GLOBAL KEG RENTAL, LLC,<br>Debtors. | Chapter 11<br><br>Case No. 6:20-bk-04126-KSJ<br><br>**Objection Deadline**: Jan. 13, 2021<br><br>**Hearing Date**: Jan. 20, 2021 at 11:00 a.m. |

## APPLICATION OF GLOBAL BEER NETWORK – WIN-IT-TOO, INC., FOR THE ALLOWANCE AND PAYMENT OF AN ADMINISTRATIVE EXPENSE

Global Beer Network – Win-it-Too, Inc. ("**GBN**") submits this application, pursuant to 11 U.S.C. § 503(b)(1)(A), for allowance and payment of an administrative expenses claim in respect of the storage, maintenance, and preservation services it provided to the Debtor, Global Asset Rental, LLC (the "**Debtor**"), for certain assets prior to the sale of those assets to International Keg, LLC (the "**Purchaser**").

### JURISDICTION AND VENUE

1.     This Court has jurisdiction to consider this Application pursuant to 11 U.S.C. § 1334. The Application is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (B).

2.     This Court represents the proper venue to address the Application pursuant to 28 U.S.C. §§ 1408 and 1409.

### BACKGROUND

Procedural History

3.     On July 23, 2020 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**").

4. Since the outset of its bankruptcy case, the Debtor pursued a sale of substantially all of its assets. Toward that end, on August 19, 2020, the Debtor filed a motion seeking approval of Bid Procedures. The Debtor succeeded in its sale endeavor and, on October 2, 2020, the Court entered the *Order (I) Authorizing the Sale of Substantially All of the Debtor's Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Authorizing and Approving the Asset Purchase Agreement; (III) Approving Procedures and Rights Related to Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (IV) Granting Related Relief* [Doc. No. 231] (the "**Sale Order**").

5. From the Petition Date through October 9, 2020 when the Purchaser closed on the sale to acquire the Debtor's assets (the "**Pre-Sale Period**"), GBN, its brewer partners, and their distributors had in their possession, custody, or control at their various warehouses and other locations a total of 23,901 kegs (the "**Kegs**") owned by the Debtor in various states of fill (i.e., some were empty and some were filled with beer).

6. GBN, its brewer partners, and their distributors came into possession of the Kegs in accordance with the terms of certain contracts between GBN and the Debtor, as well as the contracts between the Debtor and each of Schneider Weisse G. Schneider & Sohn GmbH ("**Schneider**"), Brasserie de Silly ("**Silly**"), Schneider, Brouwerij De Brabandere ("**Brabandere**"), Brouwerij Van Steenberge ("**Steenberge**"), and Stiegl Getränke & Service GmbH & Co. KG a/k/a Stiegl Brauerei GmbH ("**Stiegl**" and, together with Silly, Schneider, Brabandere, and Steenberge, the "**Brewers**").

7. GBN and each of the Brewers entered into a "Global Keg Asset Rental Agreement" with the Debtor prior to the Petition Date (collectively, the "**Contracts**"). See Declaration of

Clifford Lusso ("**Lusso Dec.**"), ¶ 4, Exs. A (Silly), B (Brabandere), C (Steenberge), D (Schneider),

E (Steigl), and F (GBN).

8.      The relevant terms of the Contracts may be summarized as follows:

a.      Under the terms of each of the contracts, the Debtor leased empty beer kegs to the Brewers that the Brewers then filled with beer and shipped to GBN for distribution within the United States.

b.      In exchange for receiving the kegs, the Brewers paid the Debtor a number of separate fees including a "Keg Deposit" for each keg to ensure that it would be returned to the Debtor after it had been used. Each of the contracts defines the phrase "Keg Deposit" with language equivalent to the following text contained in the contract between Silly and the Debtor:

One-time deposit charged for the Transfer of a Keg to an authorized location by Brewer, to be returned or refunded once the Keg is returned to a Global Keg Reclamation Center undamaged and intact ….

*See* Lusso Dec., Ex. A, ¶ 4(D).

c.      Prior to the Petition Date, the supply chain into which these kegs were inserted could be summarized as follows:

i.      The Debtor ships kegs to a brewer;

ii.      The brewer fills the kegs and sends them to GBN;

iii.      GBN ships the kegs or causes the kegs to be shipped to its distributors and those distributors ship the kegs to their retail customers (e.g., restaurants, liquor stores, etc.); and

iv.      When the kegs are emptied, the retail customers contact the distributor to arrange for retrieval of the kegs and their eventual return to the Debtor.

d.      When the Debtor ships the empty kegs to the Brewers, the Brewers are required to pay the Debtor a Keg Deposit.

e.      When the Brewers ship the kegs filled with beer to GBN, they require GBN to pay a deposit in the same amount of the Keg Deposit paid by the Brewers to the Debtor. GBN then ships the filled kegs to its distributors and those distributors pay GBN a deposit in the same amount of the Keg Deposit paid by the Brewers to the Debtor.

f.      GBN's distributors then ship the filled kegs to their retail customers (e.g., restaurants, pubs, and liquor stores, etc.), requiring those customers to pay a deposit to the distributors in the same amount of the Keg Deposit paid by the Brewers to the Debtor.

3

g.     When the kegs are emptied by the retail customers, those customers return the kegs to GBN and/or its distributors and the distributors reimburse the customers for their deposits. This process leaves GBN and its distributors with the obligation to return the kegs to the Debtor and seek reimbursement from the Debtor for the deposits that they paid.

9.     Notwithstanding the terms of the Contracts, the Debtor stopped reimbursing GBN, the Brewers, and their distributors for the Keg Deposits at some point prior to the Petition Date and it did not restart that practice after the Petition Date. GBN is working with its distributors to compensate them for some or all of the Keg Deposits and it is in the process of having them formally assign their claims to GBN, including the claims outlined in this Application.

10.     Because the Kegs were property of the Debtor's bankruptcy estate, GBN and its distributors were required to store, maintain, and preserve their value and did so at their various locations and through GBN's distribution channel. GBN and its distributors did, in fact, store, maintain, and preserve the value of these kegs by keeping them safe at its various locations through the entire Pre-Sale Period. The Debtor derived a significant economic benefit from having the Kegs stored at GBN's facilities because it did not have to incur the expenses associated with -

a.     retrieving the Kegs at an estimated expense of about $13.00 per keg,

b.     paying GBN the Keg Deposits due to it under the Contracts of $30.00 per keg upon return, or

c.     storing the Kegs at a different facility.

In total, the Debtor would have incurred more than $1 million for these expenses if GBN had not maintained the Kegs as it did during the Pre-Sale Period.

11.     Applying these figures to the 23,901 ½ barrel kegs being stored by GBN and its distributors for the nearly three-month Pre-Sale Period yields a total charge of $46,606.95.

12.    The resulting figure -- $46,606.95 -- represents the value of the storage, maintenance, and preservation services for the Kegs provided by GBN to the Debtor during the Pre-Sale Period, as a direct and demonstrable benefit to the Debtor and its estate.

## ARGUMENT

13.    Section 503(b) of the Bankruptcy Code provides a non-exhaustive list of the categories of expenses entitled to administrative priority status including, without limitation, "the actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1)(A).

14.    "It is well established that providing storage for property of the estate constitutes 'preserving the estate' within the meaning of § 503(b)(1)(A) and that post-petition storage costs therefore may be granted administrative expense priority." *In re Aerospace Technologies, Inc.,* 199 B.R. 331, 339-40 (Bankr. M.D. N.C. 1996). This is true even where there is no agreement about the storage charges between the owner of the storage facility and the debtor. *See id.* at 340; *see also In re Grimm & Rothwell, Inc.,* 108 B.R. 186, 190 (Bankr. S.D.Ohio 1989) ("Although the controverted evidence submitted at trial did not meet the quantum of proof necessary to establish the existence of a rental agreement, the Trustee's use of the warehouse as storage space was necessary and preserved the assets of the estate until such assets were eventually sold at auction. For such valuable services, an allowance for rent is equitable under the circumstances to the extent of the actual amount of space used as storage.").

15.    "The amount of a cost of administration claim arising from the use of premises to store property of the estate is the benefit accruing to the estate for the use of the premises. In such a circumstance, the measure of the benefit to the estate is the reasonable rental value of the premises which were occupied and used by the trustee." *See Aerospace Technologies,* at 340.

16.    At the conclusion of the Pre-Sale Period, the Kegs were sold by the Debtor along with substantially all of its other assets to the Purchaser for $1.25 million in cash plus a credit bid made by the Debtor's secured lender.  Absent the storage services provided by GBN, the Debtor would have had to incur expenses upwards of $1 million to retrieve and store the Kegs in the Pre-Sale Period that would have had a deleterious effect on the value of the sale process.  It follows, therefore, that GBN provided a service of significant value to the Debtor by storing the Kegs at its locations.

17.    The storage, maintenance, and preservation services provided to the Debtor by GBN during the Pre-Sale Period were "actual, necessary costs and expenses of preserving the estate." *See Aerospace Technologies,* at 340 ("During the pendency of this case and prior to the time that the Trustee could sell the Personal Property, it was necessary that the property be stored and preserved in an appropriate storage facility."); *see also Great Northern Forest Prods., Inc. v. Dock's Corner Assoc.*, 135 B.R. 46, 60 (Bankr. W.D. Mich. 1991) ("To allow the Trustee to store the property at no cost is clearly a windfall to the estate.")

18.    GBN has established that the reasonable rate for the services it provided the Debtor during the nearly three-month span of the Pre-Sale Period was $46,606.95 and, further, that this sum constitutes the actual, necessary costs and expenses of preserving the estate within the ambit of § 503(b)(1)(A) of the Bankruptcy Code.

## CONCLUSION

WHEREFORE, for the reasons noted above, the Court should grant this application and Global Beer Network-Win-it-Too, Inc. should be awarded an allowed administrative claim of

$46,606.95 that the Debtor should be pay immediately, and it should also award such other relief

as the Court may deem appropriate.

Dated: December 18, 2020

DEAN, MEAD, EGERTON, BLOODWORTH,
CAPOUANO & BOZARTH, P.A.


*/s/ Denise Dell-Powell*
Denise Dell-Powell, Esq.
Fla Bar No. 0890472
Dean, Mead, Egerton, Bloodworth, Capouano &
Bozarth, P.A.
420 S. Orange Avenue, Suite 700,
Orlando, Florida 32801
(407) 428-5176
DDPowell@deanmead.com

and

RIEMER & BRAUNSTEIN LLP
Jeffrey D. Ganz, Esq. (*pro hac vice*)
100 Cambridge Street, 22nd Floor
Boston, Massachusetts 02114
(617) 880-3568
jganz@riemerlaw.com

*Counsel for Global Beer Network – Win-it-Too, Inc.*

## CERTIFICATE OF SERVICE

I CERTIFY that the foregoing document is being filed electronically via the Court's
CM/ECF website on December 18, 2020. I further certify that the document is being served by
transmission of Notices of Electronic Filing ("NEF") generated by CM/ECF to those counsel or
parties who are registered to receive NEF in this case.

/s/  Denise Dell-Powell
Denise Dell-Powell, Esq.

2669599.1

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| In re:<br>GLOBAL ASSET RENTAL, LLC f/k/a<br>GLOBAL KEG RENTAL, LLC,<br>Debtors. | Chapter 11<br><br>Case No. 6:20-bk-04126-KSJ<br><br>**Hearing Date**: Jan. 20, 2021 at 11:00 a.m. |

**DECLARATION OF CLIFFORD LUSSO**

I, Clifford Lusso, make the following statements under the pains and penalty of perjury:

1.      I am the Chief Operating Officer of Global Beer Network – Win-it-Too, Inc. ("**GBN**") and I have personal knowledge of the matters set forth below, based in part on the books and records of GBN and those of its distributors which are maintained in the ordinary course of their respective businesses. I submit this Declaration in support of the *Application of Global Beer Network – Win-it-Too, Inc., for the Allowance and Payment of an Administrative Expense* (the "**Application**") filed by GBN in connection with the storage, maintenance, and preservation services GBN and its distributors provided to the Debtor, Global Asset Rental, LLC (the "**Debtor**") for certain assets prior to the sale of those assets to International Keg, LLC (the "**Purchaser**").

2.      From July 23, 2020 (the "**Petition Date**") when the Debtor filed its bankruptcy petition and October 9, 2020 when the Purchaser closed on the sale to acquire the Debtor's assets (the "**Pre-Sale Period**"), GBN, its brewer partners, and their distributors had in their possession, custody, or control at their various warehouses and other locations a total of 23,901 kegs owned by the Debtor (the "**Kegs**") in various states of fill (i.e., some were empty and some were filled with beer).

3.      GBN, its brewer partners, and their distributors came into possession of the Kegs in accordance with the terms of certain contracts between GBN and the Debtor, as well as the

contracts between the Debtor and each of Schneider Weisse G. Schneider & Sohn GmbH ("**Schneider**"), Brasserie de Silly ("**Silly**"), Schneider, Brouwerij De Brabandere ("**Brabandere**"), Brouwerij Van Steenberge ("**Steenberge**"), and Stiegl Getränke & Service GmbH & Co. KG a/k/a Stiegl Brauerei GmbH ("**Stiegl**" and, together with Silly, Schneider, Brabandere, and Steenberge, the "**Brewers**").

4.      GBN and each of the Brewers entered into a "Global Keg Asset Rental Agreement" with the Debtor prior to the Petition Date (collectively, the "**Contracts**"). A true and accurate copy of each of the Contracts is attached to this Declaration as Exhibits A (Silly), B (Brabandere), C (Steenberge), D (Schneider), E (Stiegl), and F (GBN). Here is a general description of the relevant terms of the Contracts:

a.      Under the terms of each of the contracts, the Debtor leased empty beer kegs to the Brewers that the Brewers then filled with beer and shipped to GBN for distribution within the United States.

b.      In exchange for receiving the kegs, the Brewers paid the Debtor a number of separate fees including a "Keg Deposit" for each keg to ensure that it would be returned to the Debtor after it had been used. Each of the contracts defines the phrase "Keg Deposit" with language equivalent to the following text contained in the contract between Silly and the Debtor:

One-time deposit charged for the Transfer of a Keg to an authorized location by Brewer, to be returned or refunded once the Keg is returned to a Global Keg Reclamation Center undamaged and intact
....

*See* Ex. A, ¶ 4(D).

c.      Prior to the Petition Date, the supply chain into which these kegs were inserted could be summarized as follows:

i.      The Debtor ships kegs to a brewer;

ii.     The brewer fills the kegs and sends them to GBN;

iii.    GBN ships the kegs or causes the kegs to be shipped to its distributors and those distributors ship the kegs to their retail customers (e.g., restaurants, liquor stores, etc.); and

iv.    When the kegs are emptied, the retail customers contact the distributor to arrange for retrieval of the kegs and their eventual return to the Debtor.

d.    When the Debtor ships the empty kegs to the Brewers, the Brewers are required to pay the Debtor a Keg Deposit.

e.    When the Brewers ship the kegs filled with beer to GBN, they require GBN to pay a deposit in the same amount of the Keg Deposit paid by the Brewers to the Debtor. GBN then ships the filled kegs to its distributors and those distributors pay GBN a deposit in the same amount of the Keg Deposit paid by the Brewers to the Debtor.

f.    GBN's distributors then ship the filled kegs to their retail customers (e.g., restaurants, pubs, and liquor stores, etc.), requiring those customers to pay a deposit to the distributors in the same amount of the Keg Deposit paid by the Brewers to the Debtor.

g.    When the kegs are emptied by the retail customers, those customers return the kegs to GBN and/or its distributors who then reimburse the customers for their deposits. This process leaves GBN and its distributors with the obligation to return the kegs to the Debtor and seek reimbursement from the Debtor for the deposits that they paid.

5.    At some point in time prior to the Petition Date, the Debtor ceased reimbursing GBN and its distributors for the Keg Deposits and made no such payments to them after the Petition Date. GBN is working with its distributors to compensate them for some or all of the Keg Deposits and is in the process of having them formally assign their claims to GBN, including the claims outlined in this Declaration and the Application. GBN's distributors and the number of kegs they are storing are identified in the document annexed to this Declaration as Exhibit G.

6.    Because the Kegs were property of the Debtor's bankruptcy estate, GBN and its distributors were required to store, maintain, and preserve their value and they did so at their various locations in GBN's distribution channel.

7.    GBN and its distributors did, in fact, store, maintain, and preserve the value of the Kegs by keeping them safe at its various locations through the entire Pre-Sale Period. The Debtor

derived a significant economic benefit from having the Kegs stored at GBN's facilities because it did not have to incur the expenses associated with -

    a.      retrieving the Kegs at an estimated expense of about $13.00 per keg depending upon its location,

    b.      paying GBN the Keg Deposits due to it under the contracts of $30 per keg upon return, or

    c.      storing the Kegs at a different facility.

In total, I believe that the Debtor would have incurred more than $1 million for these expenses if GBN and the distributors had not maintained the Kegs as they did during the Pre-Sale Period.

8.      In my role as COO for GBN, I have investigated the expense charged by warehouses in my industry for storing kegs and learned that standard storage fees are equal to $.65 per keg per month for a ½ barrel or 50 liter keg.  Applying these figures to the 23,901 ½ barrel kegs being stored by GBN and its distributors for the nearly three-month Pre-Sale Period yields a total charge of $46,606.95.

9.      Based on these calculations, I believe that this sum of $46,606.95 reflects a reasonable charge for the storage, maintenance, and preservation services for the Kegs provided by GBN and its distributors to the Debtor during the Pre-Sale Period.

In accordance with the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Executed on December 18, 2020

                          */s/ Clifford Lusso*_____
                          Clifford Lusso

# EXHIBIT A



**GLOBAL KEG ASSET RENTAL AGREEMENT**

2019
**THIS ASSET RENTAL AGREEMENT** (the "Agreement") is made on **18th** December ("**Effective Date**") between **Global Keg Rental LLC, a Nevada limited liability company** ("**Global Keg**") located at 6675 Westwood Blvd, Orlando, Florida 32821 and **Brasserie de Silly** ("**Brewer**"), located at **Rue Ville Basse 2, 7830 Silly, Belgium.**

1.  <u>Purpose of Agreement</u>

    This Agreement defines the legal and commercial relationship between Global Keg and Brewer and specifies the parties' responsibilities in relation to the rental and use of Global Keg's kegs (the "**Kegs**"). Brewer agrees to use the Kegs in accordance with the terms of this Agreement and its appendices. Commencing on the Effective Date, Brewer may begin to use Kegs for product filling and subsequent shipment to customers (distributors, wholesalers and retailers).

2.  <u>Global Keg's Responsibilities</u>

    Global Keg agrees that it will:

    A.  Rent Kegs to Brewer at the pricing and other terms as set forth in Appendices hereto.

    B.  Provide accurate and timely invoices.

    C.  Inspect and clean the exterior of all Kegs and ensure all Kegs are serviceable and "**fit for use**" per the quality guidelines referenced in Appendix 3.

    D.  Provide technical and information management services for all Kegs, as agreed with Brewer. Credit Brewer for fees charged for any Keg that is found to be not fit for use or contains defects in material and/or workmanship, except as caused by Brewer's or its agents' or employees' negligence or misuse.

    E.  Furnish Brewer with Scan equipment or Scan software and maintain Scan equipment or software to facilitate Scanning.

    F.  Furnish Brewer with a regular suite of reports with important data regarding the movement of the Kegs and the associated product data.

    G.  Global Keg will manage the reverse logistics and collection of empty Kegs with Brewer's customers.

3.  <u>Brewer's Responsibilities</u>

    Brewer agrees that it will:

    A.  Use Kegs in accordance with established industry handling standards consistent with those standards currently in place at Brewer.

    B.  Accept deliveries of Kegs from Global Keg, as well as from other Global Keg customers, Global Keg Reclamation Centers and Global Keg 3PL Warehouses, all of which will be subject to the terms of this Agreement.

    C.  Not use any Kegs that it finds to be defective, damaged or unfit for use, and separate any keg it finds to be defective, damaged, or unfit for use for collection in a reasonable time frame by Global Keg who will be notified of said defect in order to promptly repair or replace.

    D.  Acknowledge and agree that (i) Each Keg is of a size and capacity ordered by Brewer, (ii) Brewer is satisfied that each Keg rented pursuant to this Agreement is suitable for its purpose, and (iii) Global Keg rents out each Keg according to Global Keg quality guidelines, as set forth in Appendix attached hereto. Once the Kegs have been delivered and accepted by Brewer, Global Keg makes no warranty or representation, either express or implied, as to the fitness of the Kegs for any particular purpose while filled, under load or otherwise.

    GLOBAL KEG ASSET RENTAL AGREEMENT

E.  Promptly and accurately Scan and electronically report all Receipts, Fills and Transfers of Kegs to Global Keg.

F.  Clean and sanitize the Kegs in accordance with industry standards before filling with product.

G.  Upon filling a Keg, transmit Brewer supplied Keg content information to include "Sell-by-Date" and Brewer's "SKU" identifiers electronically using optical or RFID Scanning technology supplied by Global Keg or Brewer or combination thereof.

H.  Pay Global Keg invoices in accordance with the terms agreed between Global Keg and Brewer.

I.  From time to time and with proper notice allow Global Keg and its agents and employees access to Brewer's premises and vehicles (and premises and vehicles under Brewer's control) during business hours to conduct inventory of the Kegs and IT Property, inspect the condition and location of any Kegs and IT Property and verify Brewer's compliance with the terms of this Agreement, industry accepted keg handling standards and current Brewer handling, cleaning, and use practices.

J.  Transfer Kegs only to locations agreed to by Global Keg and Brewer that are permitted to possess Kegs. The list of locations authorized to receive Global Keg kegs will be updated on an as needed basis.

K.  As of the Effective Date, Brewer can Transfer Kegs only to countries listed in the Appendices. For Transfers to any other country, Brewer will notify and seek approval in advance, in writing, from Global Keg on a country by country basis.

L.  Brewer will provide electrical and network access as required to install and operate Global Keg data capture and transmission devices and computers.

M.  Brewer will provide ship to data and other reporting from time to time to facilitate Scan reconciliation of Keg movements.

4.  Rental Charges and Payment

A.  The parties agree to the rental and other terms, as set forth in Appendices concerning the rental of Kegs and Global Keg provided pallets.

B.  Invoices for the rental of Kegs may contain the following separate main charges: Issue Fee, Pallet Fee, Keg Deposit and any applicable taxes.

C.  If Brewer does not follow the Global Keg handling and Scanning procedures, then there are potential further charges which could be included in an invoice. Such as, the Do-Not-Ship Fee, Destroyed Keg Fee and Lost Keg Fee. Subsequent additional charges may be included and agreed to from time to time.

D.  All the relevant recurring charges are described as follows:

**Issue Fee** - One-time charge for each Keg charged upon receipt of Keg by Brewer set forth in Appendices.

**Pallet Fee** - A charge for the provision of each pallet in the shipment of Kegs to Brewer set forth in Appendices.

**Lost Keg Fee** - Specific charge for the loss of any Keg which is only assessed under certain circumstances set forth in Appendices.

**If the Brewer Scans and Transfers to an authorized Global Keg receiver, Brewer will not be liable for any Lost Keg Fees.**

**Keg Deposit** - One-time deposit charged for the Transfer of a Keg to an authorized location by Brewer, to be returned or refunded once the Keg is returned to a Global Keg Reclamation Center undamaged and intact set forth in Appendices.

 GLOBAL KEG ASSET RENTAL AGREEMENT

**Do Not Ship Fee** - One-time charge for the Transfer of a Keg to any location outside of approved locations or countries set forth in Appendices.

**Destroyed Keg Fee** – One-time charge to Brewer for abusing the Keg while under direct Brewer control such that it has sustained structural or other heavy damage so that it cannot be re-deployed set forth in Appendices.

**Fuel Surcharge** – A charge to Brewer per Keg if fuel prices of the average per gallon cost of diesel fuel increases.

**Inactivity Fee** - Recurring charge for Kegs not Scanned or Transferred to an authorized location within a specific time period.

E.    All charges, except for deposits, including all applicable taxes (sales, use, personal property, service or similar) and any other charges required by law, shall accrue daily and be payable within Thirty (30) days from the date of the invoice. Deposits shall be due and payable upon receipt of invoice.

F.    A late fee of 1.5% per month will be assessed on all invoices not paid within Ten (10) days of the invoice due date.

5.    Restrictions on Use of Global Keg Property

The Kegs and IT Property shall at all times remain the exclusive property of Global Keg. Brewer has no right to sell or deal with the Kegs or IT Property in any way that is inconsistent with ownership of the Kegs and IT Property by Global Keg. Brewer hereby agrees not to purchase or rent Global Keg Kegs from any source other than Global Keg or an authorized Global Keg agent, provided, however that nothing herein shall prevent Brewer from purchasing or renting kegs from a third-party in the event Global Keg is unable to meet Brewer's order requirements, and expressly waives any and all liens (including, without limitation, warehousemen's liens), security interests or any other legal or equitable claims of title to the Kegs or IT Property and shall indemnify Global Keg from and against any such claims by third parties arising out of Brewer's possession or use of the Kegs or IT Property. Upon request, Brewer shall execute any documents necessary to acknowledge, publish, file and record this Agreement and the rights of Global Keg under this Agreement.

The Kegs shall always carry Global Keg identification marks such as the Global Keg logo, telephone number, bar code label and RFID tag (utilizing Discrete Tracking Number). Brewer agrees not to remove or deface the Global Keg logo or telephone number in any manner. Brewer also agrees not to disable, remove or otherwise render inoperable the bar code label or the RFID tag.

If Brewer defaces Kegs or damages Global Keg IT Property, Brewer shall reimburse Global Keg for the cost of returning the Keg to its original condition (up to and including replacing the Keg) and repairing or replacing damaged IT Property.

The terms of Brewer's use of any software included in the IT Property are governed by the Software License attached to this Agreement as Appendix 2.



GLOBAL KEG ASSET RENTAL AGREEMENT

6.  Term and Termination

This Agreement shall have a one (1) year term and will automatically renew on the first anniversary of the Agreement unless either of the Parties indicates in writing a desire to cancel or modify the Agreement giving a minimum of six (6) months' notice in advance of the expiry of the Agreement to the other Party.

A.  Either Party may terminate this Agreement immediately by written notice if (i) bankruptcy or insolvency proceedings are brought by or against either Party, or either Party makes an arrangement with its creditors, or a receiver or administrator is appointed over any of its assets, or either Party goes into liquidation or is wound up, or either Party is subject to any other similar procedure.

B.  In the unlikely event of a material breach of a provision of this Agreement by either Party, the other Party shall have the right to terminate the Agreement immediately (i) if the material breach cannot be cured, or (ii) if the material breach remains uncured forty-five (45) days subsequent to the receipt of written notice of the material breach.

C.  Brewer must return all Kegs and IT property to Global Keg on or before thirty (30) days following termination of this Agreement in accordance with this Agreement. Any Kegs not returned to Global Keg within that period shall be subject to a replacement fee of €100 per Keg.

7.  Limitation of Liability and Indemnity

A.  Neither Party shall be liable to the other for lost revenues or profits, or indirect, special, incidental, punitive or consequential damages regardless of legal theory or foreseeability.

B.  Subject to paragraph 7.A, Brewer will indemnify Global Keg, its agents and employees against all losses, costs and damages (including reasonable attorneys' fees and expenses) which they may incur as a result of (i) any claims or suits against Global Keg, its agents and employees arising from the use of the Kegs by Brewer or any third party acting on behalf, or at the direction, of Brewer when such use is in breach of the terms of this Agreement (including, but not limited to, use that is not in accordance with the handling guidelines of Global Keg or is due to or arising out of any defect, failure, or misuse of any racking or handling equipment), and (ii) any material breach of this Agreement by Brewer. The provisions of this paragraph 7.B will survive the termination or expiration of this Agreement.

C.  Subject to paragraph 7.A, Global Keg will indemnify Brewer, its agents and employees from and against all losses, costs and damages (including reasonable attorneys' fees and expenses) arising from or related to any negligence, willful misconduct or material breach of this Agreement by Global Keg. The provisions of this paragraph 7.C will survive the termination or expiration of this Agreement.

8.  Confidentiality

Confidential Information means (a) any business or technical information of Global Keg or Brewer, including but not limited to any information relating to either Party's products, services, prices, marketing plans, business opportunities, customers, or personnel, and (b) any other information of Global Keg or Brewer that is specifically designated by the disclosing Party as confidential or proprietary. Confidential Information shall not include information that (i) is in or enters the public domain without breach of this Agreement by the receiving Party, (ii) was demonstrably in the possession of the receiving Party prior to first receiving it from the disclosing Party without restriction on disclosure, (iii) the receiving Party can demonstrate was developed by the receiving Party independently and without use of or reference to the disclosing Party's Confidential Information, or (iv) the receiving Party receives from a third party without restriction on disclosure and without breach of a nondisclosure obligation. Each Party shall maintain the Confidential Information of the other Party in strict confidence until such time as the Confidential Information falls under one of the exceptions listed in items (i) through (iv) above. Each Party shall exercise no less than reasonable care with respect to the handling and protection of such Confidential Information. Each Party shall use the Confidential Information of the other Party only to perform its obligations under this Agreement, and shall disclose such Confidential Information only to its employees and independent contractors who are subject to binding use and disclosure restrictions at

    GLOBAL KEG ASSET RENTAL AGREEMENT

least as protective as those set forth herein and only as is reasonably required in connection with the exercise of its rights and obligations under this Agreement. Notwithstanding the above, the receiving Party may disclose Confidential Information of the disclosing Party pursuant to a valid order or requirement of a court or government agency, provided that the receiving Party gives prompt notice to the disclosing Party upon receiving the order or learning of the requirement. Any such disclosure by the receiving Party of the Confidential Information of the disclosing Party, shall, in no way, be deemed to change, affect or diminish the confidential status of such Confidential Information.

9.  Designated Representative

Brewer's Designated Representative and the address, phone number, facsimile number and email address for notice to the Designated Representative as well as the email address to which electronic invoices should be directed are:

| | |
|---|---|
| Designated Representative: | Lionel Van der Haegen |
| Address: | Rue Ville Basse 2 – B7830 Silly - Belgium |
| Phone No: | +32 68 25 04 80 |
| Facsimile No: | +32 68 56 84 36 |
| Contact Email Address: | lionel@silly-beer.com |
| Email Address for Delivery of Electronic Invoices: | silly@silly-beer.com for invoices and michael@silly-beer.com for deliveries |

10. Headings The headings in this Agreement are inserted for convenience only and shall not affect the construction or interpretation of this Agreement.

11. Applicable Law, Arbitration This Agreement shall be deemed to be made under, and to be governed by, the laws of the State of Florida in the United States.

12. Waiver A waiver by either Party of any term or condition of this agreement in any instance shall not be deemed or construed to be a waiver of such term or condition for the future, or any subsequent breach thereof.

13. Severability If any provision of this Agreement is determined to be invalid, illegal, or unenforceable to any extent by an arbitrator or court of competent jurisdiction, that provision shall be construed as though more narrowly drawn if a narrower construction would avoid invalidity, illegality, or unenforceability, or if that is not possible, such provision shall be severed and the remaining provisions of this Agreement shall remain in effect.

14. Assignment Neither Party shall have the right to assign, transfer and/or sublicense its rights and/or duties and obligations arising under this Agreement, either in whole or in part, without the prior written consent of the other Party, such consent not to be unreasonably withheld, conditioned and/or delayed.

15. Entire Understanding This Agreement constitutes the whole and entire agreement of the Parties with respect to the subject matter of this Agreement, and it shall not be modified or amended in any respect except by a written instrument executed by both Parties. This Agreement replaces and supersedes all prior agreement whether written or oral between the parties with respect to the subject matter herein.

16. Counterparts This Agreement may be executed in counterparts, each of which will be deemed an original Agreement for all purposes and which collectively will constitute one and the same Agreement.

 **GLOBAL KEG ASSET RENTAL AGREEMENT**

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

By:    Brasserie de Silly

_Lionel Van der Haegen, Managing Director_

By: GLOBAL KEG RENTAL, LLC

Bobby L. Moore, Chief Executive

 GLOBAL KEG ASSET RENTAL AGREEMENT

## APPENDIX 1

### CHARGES FOR USE OF GLOBAL KEG KEGS

1.  All pricing in Appendix 1 is denominated in € (Euro).

2.  Issue Fees are based on minimum orders of at least 4 unit loads per order (a unit load is minimum of 3 pallets high).

3.  Issue Fees will be assessed at the Domestic Issue Fee price upon shipment of Kegs to Brewer. The remaining Issue Fee balance owed will be invoiced at the time of Transfer based on shipment to the Geographic Zone shipped to. Any shipment to a Distributor/Importer must be approved and agreed to in writing by Global Keg in advance of shipment or be subject to a **Do Not Ship Fee.**

| SUMMARY OF ISSUE FEES IN € EURO BY GEOGRAPHIC ZONE | | | | |
|---|---|---|---|---|
| **Issue Fee Types** | **50L - 1/2bbl** | **30L - 1/4bbl** | **20L - 1/6bbl** | **Description** |
| Domestic | 9.50 | 8.50 | 7.50 | Transfer of a Keg where the Keg is shipped direct to Retail or to a Distributor based in Brewers own country |
| European | 13.00 | 11.75 | 10.50 | Transfer of a Keg to a Distributor/Importer located in Europe (within the EU) |
| North American | 14.50 | 13.00 | 11.50 | Transfer of a Keg to a Distributor/Importer located in the USA or Canada |
| Asian | 15.80 | 15.00 | 13.30 | Transfer of a Keg to a Distributor/Importer located in Asia |
| Australasian | 15.80 | 15.00 | 13.30 | Transfer of a Keg to a Distributor/Importer located in Australia/New Zealand |
| South American | 15.80 | 15.00 | 13.30 | Transfer of a Keg to a Distributor/Importer located in South America |
| Other/Exceptional | 17.50 | 16.20 | 15.00 | Any Transfer of a Keg to a country with exceptional reverse logistics costs (e.g. Kazakhstan). |

A deposit on each Keg will also be assessed if appropriate, as per section 8 of Appendix 1.
The costs above represent the total charges Brewer owes Global Keg for filling a rental keg.

Keg deposit will be charged in Euro at exchange rate valid at time of invoicing.

4.  A one-time **Implementation Deposit** of €4,000 will be charged per Brewer to provide a scanning solution to enable Brewer to Scan Kegs and must be paid before install begins and Kegs ship to Brewer. This Deposit will be refundable once all Global Keg assets have been returned in good working order to Global Keg and all

  GLOBAL KEG ASSET RENTAL AGREEMENT

outstanding invoices and fees paid. Any owed amounts by Brewer to Global Keg may be withheld from this deposit.

5.    If the shipments of Kegs to Brewer are palletized loads, then a **Pallet Fee** of € 10 will be charged for each standard Euro wood pallet.

6.    **Lost Keg Fee** will result when a keg is deemed by Brewer to be lost **while under their direct control** and a lost fee of €95 on a Half Barrel/50L, €85 on a Quarter Barrel/30L and €75 on a Sixth Barrel/20L for each Keg will be charged to Brewer. For the avoidance of doubt, a Keg is under the direct control of Brewer from the moment it is Scanned in on delivery to the brewery to the moment it is Scanned out to an authorized receiver. A **Lost Keg Fee** will also result if a Keg is transferred to an authorized receiver and Global Keg is not electronically notified within 90 days per the requirements of Section 3, "Brewer's Responsibilities". For any Keg that was previously charged to the Brewer as 'lost' and is subsequently located by Global Keg, the Lost Keg Fee will be credited to the Brewer less any applicable fees. **Once the keg has been Scanned and Transferred to an authorized Global Keg receiver, Brewer will not be liable for any Lost Keg Fees.**

7.    An **Inactivity Fee** per Keg, equivalent to the Local or Domestic Issue Fee, will be charged in the event that Kegs requested to be delivered to Brewer (or any third-party owned brewing facilities utilized by Brewer) are not Scanned and Transferred to a Wholesaler/Distributor/Importer or Retailer within forty five (45) days from date of Issue and each subsequent forty five day (45) period or utilized in relation to other sales contemplated by this Agreement

8.    Global Keg will charge Brewer a base **Keg Deposit** on all Kegs issued to Brewer which will be payable on receipt. As an example, but not limited to, USD $30 US in the U.S.A., CAD $50 in Canada, GBP £30 in the UK, EUR €30 in most European countries, YEN ¥3,000 in Japan, AUD $45 in Australia, etc. Brewer is responsible for recouping this deposit charge from its Wholesaler/Distributor/Importer or Retailer. Once the empty Keg has been Scanned in and returned to a Global Keg Reclamation Center undamaged and intact, Global Keg will return the deposit it collected from the Brewer to the Wholesaler/Distributor/Importer/Retailer in the same amount and currency value collected by Global Keg.

**Higher Deposit Market**
Once the Keg is Scanned and Transferred to an Authorized **Global Keg Receiver** if the deposit amount applicable is higher for that country or location the keg is Transferred to Global Keg will charge the incremental difference but never refund or credit an amount below the original deposit charged.

9.    In the case of a shipment to any receiver not pre-approved by Global Keg, Brewer will be charged a **Do Not Ship Fee** of €95. The Do-Not-Ship Fee will be credited back to Brewer if, at any time, the Keg for which Brewer has paid such charge is identified by Discrete Tracking Number and located anywhere at a Global Keg authorized location.

10.   A **Destroyed Keg Fee** of €95 will be charged to Brewer for abusing the Keg while in Brewer control such that it has sustained structural damage or such other heavy damage that it cannot be re-deployed.

11.   If Brewer rents less than 200 kegs average in a calendar month, all kegs issued in that month will be invoiced at the highest Issue Fee available.

12.   A keg requirement Annual Forecast must be provided to Global Keg both when initiating business (via the brewery profile) and by September 1st each year outlining the anticipated monthly keg rental requirements by Keg size, valve type and use category for the subsequent year. In the event that the quantity of Kegs to be delivered in a particular calendar quarter is less than 85% of the Brewer's annual forecasted quantity by quarter, Brewer may be charged the difference of actual quantity ordered versus the forecasted quantity up to 85% of the aggregate estimated fees for that quarter as a **Forecast Commitment** for the quantity of Kegs based on the Keg sizes, valve types and use categories forecast.



GLOBAL KEG ASSET RENTAL AGREEMENT

## APPENDIX 2

### SOFTWARE LICENSE

Background.

Global Keg owns and/or has been granted licenses from third party software companies to use and to sublicense to Global Keg's customers and service providers certain software for use in connection with the rental and use of the Kegs. This Appendix to the Agreement sets forth the terms and conditions by which Global Keg grants to Brewer a license or sublicense to such software and other software that Global Keg may provide to Brewer in connection with use, storage and handling of any Kegs.

1.  Global Keg grants to Brewer, during the term of the Agreement, a non-exclusive license or sublicense, as the case may be, to use the Software solely in connection with the use, storage and handling of the Kegs in accordance with the Agreement, and for no other purpose.

2.  Global Keg will either:
    (i)   Provide software for installation on existing hardware (i.e. customer owned Scanning devices, computers, tablets or smart phones) at no additional cost to Brewer; and/or
    (ii)  Provide hardware and equipment, including RFID and/or barcode Scanners and associated equipment intended specifically for the Scanning of the Kegs' Discrete Tracking Numbers and the related data concerning the product within the Keg, its destination, expiry, etc. at no additional cost to Brewer.

    Global Keg will own, maintain and service said provided equipment and software for the life of this Agreement and subsequent future Agreements. Provision of said software or equipment is at Global Keg's complete discretion.

3.  Brewer will follow recommended practices and guidelines and provide proper care for Global Keg provided equipment as specified in applicable user guides.

4.  Where available and agreed by both parties, Global Keg will facilitate software integration and Brewer agrees to co-develop an approved software integration solution with existing Manufacturing/Shipping/Warehouse Management Systems (i.e. Route Accounting, Red Prairie, SAP, etc.). Brewer will make the necessary modifications to management systems to allow for integration of the Global Keg Discrete Tracking Numbers to be associated with their respective product or shipping identifiers at Global Keg's cost. These associated identifiers and the Global Keg Discrete Tracking Number record is then utilized to electronically inform Global Keg of the current whereabouts, transfer or movement of each discrete Keg to a downstream location (i.e. Wholesaler, Distributor, or Retailer).

## Appendix 3

### GLOBAL KEG QUALITY GUIDELINES

1.  Kegs will ship to Brewer stripped of any obvious non-Global Keg external markings (stickers, tax discs etc.) and drained of more than 70 % of liquid.
2.  Kegs will ship to Brewer unitized on a pallet.
3.  Kegs will ship to Brewer with an intact valve that does not leak.
4.  Kegs will ship to Brewer with no substantial structural damage to the chime or Keg body

If any Kegs are shipped that do not meet these criteria, Global Keg will credit Brewer €10 per keg and replace or repair damaged Kegs at Global Keg's own cost.

 GLOBAL KEG ASSET RENTAL AGREEMENT

13. Orders must be made at least ten (10) business days prior to the requested delivery date. Orders must be materially similar to the forecasted volumes although Global Keg will always do its utmost to meet Brewer's needs. Orders of less than ten (10) business days prior to the requested delivery date are "Emergency Orders" and are and will include an additional expedite fee on a "pass through" basis subject to Global Keg approval and Brewer acceptance.

14. Orders for Kegs cancelled within five (5) business days where the Kegs have already been shipped will be assessed a €75 cancellation fee plus actual costs incurred by Global Keg for shipment of that order.

15. Brewer is responsible for any international brokerage fees, tariffs or taxes.

# EXHIBIT B

 **GLOBAL KEG ASSET RENTAL AGREEMENT**

**THIS ASSET RENTAL AGREEMENT** (the "**Agreement**") is made on 29/07/19 ("**Effective Date**") between Global Keg Rental LLC, a Nevada limited liability company ("**Global Keg**") located at 6675 Westwood Blvd, Orlando, Florida 32821 and Brouwerij De Brabandere  ("**Brewer**"), located at Rijksweg 33, 8531 Bavikhove, Belgium.

1.   Purpose of Agreement

This Agreement defines the legal and commercial relationship between Global Keg and Brewer and specifies the parties' responsibilities in relation to the rental and use of Global Keg's kegs (the "**Kegs**"). Brewer agrees to use the Kegs in accordance with the terms of this Agreement and its appendices.  Commencing on the Effective Date, Brewer may begin to use Kegs for product filling and subsequent shipment to customers (distributors, wholesalers and retailers).

2.   Global Keg's Responsibilities

Global Keg agrees that it will:

A.   Rent Kegs to Brewer at the pricing and other terms as set forth in Appendices hereto.

B.   Provide accurate and timely invoices.

C.   Inspect and clean the exterior of all Kegs and ensure all Kegs are serviceable and "**fit for use**" per the quality guidelines referenced in Appendix 3.

D.   Provide technical and information management services for all Kegs, as agreed with Brewer.  Credit Brewer for fees charged for any Keg that is found to be not fit for use or contains defects in material and/or workmanship, except as caused by Brewer's or its agents' or employees' negligence or misuse.

E.   Furnish Brewer with Scan equipment or Scan software and maintain Scan equipment or software to facilitate Scanning.

F.   Furnish Brewer with a regular suite of reports with important data regarding the movement of the Kegs and the associated product data.

G.   Global Keg will manage the reverse logistics and collection of empty Kegs with Brewer's customers.

3.   Brewer's Responsibilities

Brewer agrees that it will:

A.   Use Kegs in accordance with established industry handling standards consistent with those standards currently in place at Brewer.

B.   Accept deliveries of Kegs from Global Keg, as well as from other Global Keg customers, Global Keg Reclamation Centers and Global Keg 3PL Warehouses, all of which will be subject to the terms of this Agreement.

C.   Not use any Kegs that it finds to be defective, damaged or unfit for use, and separate any keg it finds to be defective, damaged, or unfit for use for collection in a reasonable time frame by Global Keg who will be notified of said defect in order to promptly repair or replace.

D.   Acknowledge and agree that (i) Each Keg is of a size and capacity ordered by Brewer, (ii) Brewer is satisfied that each Keg rented pursuant to this Agreement is suitable for its purpose, and (iii) Global Keg rents out each Keg according to Global Keg quality guidelines, as set forth in Appendix attached hereto. Once the Kegs have been delivered and accepted by Brewer, Global Keg makes no warranty or representation, either express or implied, as to the fitness of the Kegs for any particular purpose while filled, under load or otherwise.

 **GLOBAL KEG ASSET RENTAL AGREEMENT**

E. Promptly and accurately Scan and electronically report all Receipts, Fills and Transfers of Kegs to Global Keg.

F. Clean and sanitize the Kegs in accordance with industry standards before filling with product.

G. Upon filling a Keg, transmit Brewer supplied Keg content information to include "Sell-by-Date" and Brewer's "SKU" identifiers electronically using optical or RFID Scanning technology supplied by Global Keg or Brewer or combination thereof.

H. Pay Global Keg invoices in accordance with the terms agreed between Global Keg and Brewer.

I. From time to time and with proper notice allow Global Keg and its agents and employees access to Brewer's premises and vehicles (and premises and vehicles under Brewer's control) during business hours to conduct inventory of the Kegs and IT Property, inspect the condition and location of any Kegs and IT Property and verify Brewer's compliance with the terms of this Agreement, industry accepted keg handling standards and current Brewer handling, cleaning, and use practices.

J. Transfer Kegs only to locations agreed to by Global Keg and Brewer that are permitted to possess Kegs. The list of locations authorized to receive Global Keg kegs will be updated on an as needed basis.

K. As of the Effective Date, Brewer can Transfer Kegs only to countries listed in the Appendices. For Transfers to any other country, Brewer will notify and seek approval in advance, in writing, from Global Keg on a country by country basis.

L. Brewer will provide electrical and network access as required to install and operate Global Keg data capture and transmission devices and computers.

M. Brewer will provide ship to data and other reporting from time to time to facilitate Scan reconciliation of Keg movements.

4.  Rental Charges and Payment

A. The parties agree to the rental and other terms, as set forth in Appendices concerning the rental of Kegs and Global Keg provided pallets.

B. Invoices for the rental of Kegs may contain the following separate main charges: Issue Fee, Pallet Fee, Keg Deposit and any applicable taxes.

C. If Brewer does not follow the Global Keg handling and Scanning procedures, then there are potential further charges which could be included in an invoice. Such as, the Do-Not-Ship Fee, Destroyed Keg Fee and Lost Keg Fee. Subsequent additional charges may be included and agreed to from time to time.

D. All the relevant recurring charges are described as follows:

**Issue Fee** - One-time charge for each Keg charged upon receipt of Keg by Brewer set forth in Appendices.

**Pallet Fee** - A charge for the provision of each pallet in the shipment of Kegs to Brewer set forth in Appendices.

**Lost Keg Fee** - Specific charge for the loss of any Keg which is only assessed under certain circumstances set forth in Appendices.

**If the Brewer Scans and Transfers to an authorized Global Keg receiver, Brewer will not be liable for any Lost Keg Fees.**

**Keg Deposit** - One-time deposit charged for the Transfer of a Keg to an authorized location by Brewer, to be returned or refunded once the Keg is returned to a Global Keg Reclamation Center undamaged and intact set forth in Appendices.

 **GLOBAL KEG ASSET RENTAL AGREEMENT**

**Do Not Ship Fee** - One-time charge for the Transfer of a Keg to any location outside of approved locations or countries set forth in Appendices.

**Destroyed Keg Fee** – One-time charge to Brewer for abusing the Keg while under direct Brewer control such that it has sustained structural or other heavy damage so that it cannot be re-deployed set forth in Appendices.

**Fuel Surcharge** – A charge to Brewer per Keg if fuel prices of the average per gallon cost of diesel fuel increases.

E.  All charges, including all applicable taxes (sales, use, personal property, service or similar) and any other charges required by law, shall accrue daily and be payable within Thirty (30) days from the date of the invoice.

F.  A late fee of 1.0 % per month will be assessed on all invoices not paid within Ten (10) days of the invoice due date.

5.  <u>Restrictions on Use of Global Keg Property</u>

The Kegs and IT Property shall at all times remain the exclusive property of Global Keg. Brewer has no right to sell or deal with the Kegs or IT Property in any way that is inconsistent with ownership of the Kegs and IT Property by Global Keg. Brewer hereby agrees not to purchase or rent Global Keg Kegs from any source other than Global Keg or an authorized Global Keg agent, provided, however that nothing herein shall prevent Brewer from purchasing or renting kegs from a third-party in the event Global Keg is unable to meet Brewer's order requirements, and expressly waives any and all liens (including, without limitation, warehousemen's liens), security interests or any other legal or equitable claims of title to the Kegs or IT Property and shall indemnify Global Keg from and against any such claims by third parties arising out of Brewer's possession or use of the Kegs or IT Property. Upon request, Brewer shall execute any documents necessary to acknowledge, publish, file and record this Agreement and the rights of Global Keg under this Agreement.

The Kegs shall always carry Global Keg identification marks such as the Global Keg logo, telephone number, bar code label and RFID tag (utilizing Discrete Tracking Number). Brewer agrees not to remove or deface the Global Keg logo or telephone number in any manner. Brewer also agrees not to disable, remove or otherwise render inoperable the bar code label or the RFID tag.

If Brewer defaces Kegs or damages Global Keg IT Property, Brewer shall reimburse Global Keg for the cost of returning the Keg to its original condition (up to and including replacing the Keg) and repairing or replacing damaged IT Property.

The terms of Brewer's use of any software included in the IT Property are governed by the Software License attached to this Agreement as Appendix 2.

 **GLOBAL KEG ASSET RENTAL AGREEMENT**

6.  Term and Termination

    This Agreement shall have a one (1) year term and will automatically renew on the first anniversary of the Agreement unless either of the Parties indicates in writing a desire to cancel or modify the Agreement giving a minimum of six (6) months' notice in advance of the expiry of the Agreement to the other Party.

    A.  Either Party may terminate this Agreement immediately by written notice if (i) bankruptcy or insolvency proceedings are brought by or against either Party, or either Party makes an arrangement with its creditors, or a receiver or administrator is appointed over any of its assets, or either Party goes into liquidation or is wound up, or either Party is subject to any other similar procedure.

    B.  In the unlikely event of a material breach of a provision of this Agreement by either Party, the other Party shall have the right to terminate the Agreement immediately (i) if the material breach cannot be cured, or (ii) if the material breach remains uncured forty-five (45) days subsequent to the receipt of written notice of the material breach.

    C.  Brewer must return all Kegs and IT property to Global Keg on or before thirty (30) days following termination of this Agreement in accordance with this Agreement. Any Kegs not returned to Global Keg within that period shall be subject to a replacement fee of €100 per Keg.

7.  Limitation of Liability and Indemnity

    A.  Neither Party shall be liable to the other for lost revenues or profits, or indirect, special, incidental, punitive or consequential damages regardless of legal theory or foreseeability.

    B.  Subject to paragraph 7.A, Brewer will indemnify Global Keg against all losses, costs and damages which they may incur as a result of (i) any claims or suits against Global Keg arising from the use of the Kegs by Brewer or any third party acting on behalf of Brewer when such use is in breach of the terms of this Agreement (including, but not limited to, use that is not in accordance with the handling guidelines of Global Keg or is due to or arising out of any defect, failure, or misuse of any racking or handling equipment), and (ii) any material breach of this Agreement by Brewer. The provisions of this paragraph 7.B will survive the termination or expiration of this Agreement.

    C.  Subject to paragraph 7.A, Global Keg will indemnify Brewer from and against all losses, costs and damages arising from or related to any negligence, willful misconduct or material breach of this Agreement by Global Keg. The provisions of this paragraph 7.C will survive the termination or expiration of this Agreement.

8.  Confidentiality

    Confidential Information means (a) any business or technical Information of Global Keg or Brewer, including but not limited to any information relating to either Party's products, services, prices, marketing plans, business opportunities, customers, or personnel, and (b) any other information of Global Keg or Brewer that is specifically designated by the disclosing Party as confidential or proprietary. Confidential Information shall not include information that (i) is in or enters the public domain without breach of this Agreement by the receiving Party, (ii) was demonstrably in the possession of the receiving Party prior to first receiving it from the disclosing Party without restriction on disclosure, (iii) the receiving Party can demonstrate was developed by the receiving Party independently and without use of or reference to the disclosing Party's Confidential Information, or (iv) the receiving Party receives from a third party without restriction on disclosure and without breach of a nondisclosure obligation. Each Party shall maintain the Confidential Information of the other Party in strict confidence until such time as the Confidential Information falls under one of the exceptions listed in items (i) through (iv) above. Each Party shall exercise no less than reasonable care with respect to the handling and protection of such Confidential Information. Each Party shall use the Confidential Information of the other Party only to perform its obligations under this Agreement, and shall disclose such Confidential Information only to its employees and independent contractors who are subject to binding use and disclosure restrictions at least as protective as those set forth herein and only as is reasonably required in connection with the exercise



 **GLOBAL KEG ASSET RENTAL AGREEMENT**

of its rights and obligations under this Agreement. Notwithstanding the above, the receiving Party may disclose Confidential Information of the disclosing Party pursuant to a valid order or requirement of a court or government agency, provided that the receiving Party gives prompt notice to the disclosing Party upon receiving the order or learning of the requirement. Any such disclosure by the receiving Party of the Confidential Information of the disclosing Party, shall, in no way, be deemed to change, affect or diminish the confidential status of such Confidential Information.

Is designated as confidential by Brewer : all data regarding the movement of the kegs and the associated product data.

9.    Designated Representative

Brewer's Designated Representative and the address, phone number, facsimile number and email address for notice to the Designated Representative as well as the email address to which electronic invoices should be directed are:

| | |
|---|---|
| Designated Representative: | Pieter Maes |
| Address: | Rijksweg 33<br>B-8531 Bavikhove<br>Belgium |
| Phone No: | +3256650461 |
| Facsimile No: | N.A. |
| Contact Email Address: | Pieter.maes@brouwerijdebrabandere.be |
| Email Address for Delivery of Electronic Invoices: | facturatie@brouwerijdebrabandere.be |

10.    Headings The headings in this Agreement are inserted for convenience only and shall not affect the construction or interpretation of this Agreement.

11.    Applicable Law, Arbitration The present Contract is governed by Belgian law. In case any disputes and disagreements arise between the Parties out of the present Contract or in relation hereto, the Parties shall take all necessary measures to settle such disputes and disagreements by negotiations. If the Parties fail to reach an agreement, then all the disputes between the Parties shall be referred to the Courts of Kortrijk, Belgium

12.    Waiver A waiver by either Party of any term or condition of this agreement in any instance shall not be deemed or construed to be a waiver of such term or condition for the future, or any subsequent breach thereof.

13.    Severability If any provision of this Agreement is determined to be invalid, illegal, or unenforceable to any extent by an arbitrator or court of competent jurisdiction, that provision shall be construed as though more narrowly drawn if a narrower construction would avoid invalidity, illegality, or unenforceability, or if that is not possible, such provision shall be severed and the remaining provisions of this Agreement shall remain in effect.

14.    Assignment Neither Party shall have the right to assign, transfer and/or sublicense its rights and/or duties and obligations arising under this Agreement, either in whole or in part, without the prior written consent of the other Party, such consent not to be unreasonably withheld, conditioned and/or delayed.

15.    Entire Understanding This Agreement constitutes the whole and entire agreement of the Parties with respect to the subject matter of this Agreement, and it shall not be modified or amended in any respect except by a written



**GLOBAL KEG ASSET RENTAL AGREEMENT**

instrument executed by both Parties. This Agreement replaces and supersedes all prior agreement whether written or oral between the parties with respect to the subject matter herein.

16.    <u>Counterparts</u> This Agreement may be executed in counterparts, each of which will be deemed an original Agreement for all purposes and which collectively will constitute one and the same Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

By:    Brouwerij De Brabandere

_____
Albert De Brabandere

By: GLOBAL KEG RENTAL, LLC

_____
Bobby L. Moore, Chief Executive

 **GLOBAL KEG**

**GLOBAL KEG ASSET RENTAL AGREEMENT**

## Amendment 1 to the original Rental Agreement dated July 29, 2019

Date : October 4, 2019.

Amendments to Contract between Global Keg and Brouwerij de Brabandere.

1.  Appendix 1, article 7 to be replaced by

    ' Global Keg will charge Brewer a base Keg Deposit on all Kegs issued to Brewer which will be payable on receipt. As an example, but not limited to, USD ⬤ US in the U.S.A., CAD ⬤ in Canada, GBP ⬤ in the UK, EUR ⬤ in most European countries, YEN ⬤ in Japan, AUD ⬤ in Australia, etc. Brewer is responsible for recouping this deposit charge from its Wholesaler/Distributor/Importer or Retailer. Once the empty Keg has been Scanned in and returned to a Global Keg Reclamation Center undamaged and intact, Global Keg will return the deposit it collected from the Brewer to the Wholesaler/Distributor/Importer/Retailer in the same amount and currency value collected by Global Keg.
    **Higher Deposit Market**
    Once the Keg is Scanned and Transferred to an Authorized Global Keg Receiver if the deposit amount applicable is higher for that country or location the keg is Transferred to Global Keg will charge the incremental difference but never refund or credit an amount below the original deposit charged.

    Global Keg, for kegs shipped into U.S.A., will bill the ⬤ US in Euro to the Brewer, based on the exchange rate applicable at time of issue of invoice

2.  Inactivity fee.  Global Keg agrees not to apply inactivity fee in the first contract year. Brouwerij De Brabandere commits to ensure the transit time between delivery of empty kegs at the brewery and departure at the brewery is kept to a minimum.  Goal is to reach 45 days transit time.
    After first contract anniversary, as from August 1, 2020, inactivity fee will be due. Details will be discussed June 2020.

By: Brouwerij De Brabandere

Albert De Brabandere

By: GLOBAL KEG RENTAL, LLC

Bobby L. Moore, Chief Executive

# EXHIBIT C

 GLOBAL KEG ASSET RENTAL AGREEMENT

**THIS ASSET RENTAL AGREEMENT** (the "**Agreement**") is made on _____("**Effective Date**") between **Global Keg Rental LLC, a Nevada limited liability company** ("**Global Keg**") located at **6675 Westwood Blvd, Orlando, Florida 32821** and Brouwerij Van Steenberge ("**Brewer**"), located at Lindenlaan 25, 9940 Ertvelde, Belgium.

1.  Purpose of Agreement

    This Agreement defines the legal and commercial relationship between Global Keg and Brewer and specifies the parties' responsibilities in relation to the rental and use of Global Keg's kegs (the "**Kegs**"). Brewer agrees to use the Kegs in accordance with the terms of this Agreement and its appendices. Commencing on the Effective Date, Brewer may begin to use Kegs for product filling and subsequent shipment to customers (distributors, wholesalers and retailers).

2.  Global Keg's Responsibilities

    Global Keg agrees that it will:

    A.  Rent Kegs to Brewer at the pricing and other terms as set forth in Appendices hereto.

    B.  Provide accurate and timely invoices.

    C.  Inspect and clean the exterior of all Kegs and ensure all Kegs are serviceable and "**fit for use**" per the quality guidelines referenced in Appendix 3.

    D.  Provide technical and information management services for all Kegs, as agreed with Brewer. Credit Brewer for fees charged for any Keg that is found to be not fit for use or contains defects in material and/or workmanship, except as caused by Brewer's or its agents' or employees' negligence or misuse.

    E.  Furnish Brewer with Scan equipment or Scan software and maintain Scan equipment or software to facilitate Scanning.

    F.  Furnish Brewer with a regular suite of reports with important data regarding the movement of the Kegs and the associated product data.

    G.  Global Keg will manage the reverse logistics and collection of empty Kegs with Brewer's customers.

3.  Brewer's Responsibilities

    Brewer agrees that it will:

    A.  Use Kegs in accordance with established industry handling standards consistent with those standards currently in place at Brewer.

    B.  Accept deliveries of Kegs from Global Keg, as well as from other Global Keg customers, Global Keg Reclamation Centers and Global Keg 3PL Warehouses, all of which will be subject to the terms of this Agreement.

    C.  Not use any Kegs that it finds to be defective, damaged or unfit for use, and separate any keg it finds to be defective, damaged, or unfit for use for collection in a reasonable time frame by Global Keg who will be notified of said defect in order to promptly repair or replace.

    D.  Acknowledge and agree that (i) Each Keg is of a size and capacity ordered by Brewer, (ii) Brewer is satisfied that each Keg rented pursuant to this Agreement is suitable for its purpose, and (iii) Global Keg rents out each Keg according to Global Keg quality guidelines, as set forth in Appendix attached hereto. Once the Kegs have been delivered and accepted by Brewer, Global Keg makes no warranty or representation, either express or implied, as to the fitness of the Kegs for any particular purpose while filled, under load or otherwise.



 GLOBAL KEG ASSET RENTAL AGREEMENT

E.  Promptly and accurately Scan and electronically report all Receipts, Fills and Transfers of Kegs to Global Keg.

F.  Clean and sanitize the Kegs in accordance with industry standards before filling with product.

G.  Upon filling a Keg, transmit Brewer supplied Keg content information to include "Sell-by-Date" and Brewer's "SKU" identifiers electronically using optical or RFID Scanning technology supplied by Global Keg or Brewer or combination thereof.

H.  Pay Global Keg invoices in accordance with the terms agreed between Global Keg and Brewer.

I.  From time to time and with proper notice allow Global Keg and its agents and employees access to Brewer's premises and vehicles (and premises and vehicles under Brewer's control) during business hours to conduct inventory of the Kegs and IT Property, inspect the condition and location of any Kegs and IT Property and verify Brewer's compliance with the terms of this Agreement, industry accepted keg handling standards and current Brewer handling, cleaning, and use practices.

J.  Transfer Kegs only to locations agreed to by Global Keg and Brewer that are permitted to possess Kegs. The list of locations authorized to receive Global Keg kegs will be updated on an as needed basis.

K.  As of the Effective Date, Brewer can Transfer Kegs only to countries listed in the Appendices. For Transfers to any other country, Brewer will notify and seek approval in advance, in writing, from Global Keg on a country by country basis.

L.  Brewer will provide electrical and network access as required to install and operate Global Keg data capture and transmission devices and computers.

M.  Brewer will provide ship to data and other reporting from time to time to facilitate Scan reconciliation of Keg movements.

4.  Rental Charges and Payment

A.  The parties agree to the rental and other terms, as set forth in Appendices concerning the rental of Kegs and Global Keg provided pallets.

B.  Invoices for the rental of Kegs may contain the following separate main charges: Issue Fee, Pallet Fee, Keg Deposit and any applicable taxes.

C.  If Brewer does not follow the Global Keg handling and Scanning procedures, then there are potential further charges which could be included in an invoice. Such as, the Do-Not-Ship Fee, Destroyed Keg Fee and Lost Keg Fee. Subsequent additional charges may be included and agreed to from time to time.

D.  All the relevant recurring charges are described as follows:

**Issue Fee** - One-time charge for each Keg charged upon receipt of Keg by Brewer set forth in Appendices.

**Pallet Fee** - A charge for the provision of each pallet in the shipment of Kegs to Brewer set forth in Appendices.

**Lost Keg Fee** - Specific charge for the loss of any Keg which is only assessed under certain circumstances set forth in Appendices.

**If the Brewer Scans and Transfers to an authorized Global Keg receiver, Brewer will not be liable for any Lost Keg Fees.**

**Keg Deposit** - One-time deposit charged for the Transfer of a Keg to an authorized location by Brewer, to be returned or refunded once the Keg is returned to a Global Keg Reclamation Center undamaged and intact set forth in Appendices.

 GLOBAL KEG ASSET RENTAL AGREEMENT

**Do Not Ship Fee -** One-time charge for the Transfer of a Keg to any location outside of approved locations or countries set forth in Appendices.

**Destroyed Keg Fee –** One-time charge to Brewer for abusing the Keg while under direct Brewer control such that it has sustained structural or other heavy damage so that it cannot be re-deployed set forth in Appendices.

**Fuel Surcharge –** At moment of signature of contract no fuel surcharge applicable. Global Keg reserves the right to charge to Brewer per Keg if fuel prices of the average per gallon cost of diesel fuel increases and will communicate this well in advance and documented.

E.   All charges, including all applicable taxes (sales, use, personal property, service or similar) and any other charges required by law, shall accrue daily and be payable within Thirty (30) days from the date of the invoice.

F.   A late fee of 1.5% per month will be assessed on all invoices not paid within Ten (10) days of the invoice due date.

5.   <u>Restrictions on Use of Global Keg Property</u>

The Kegs and IT Property shall at all times remain the exclusive property of Global Keg. Brewer has no right to sell or deal with the Kegs or IT Property in any way that is inconsistent with ownership of the Kegs and IT Property by Global Keg. Brewer hereby agrees not to purchase or rent Global Keg Kegs from any source other than Global Keg or an authorized Global Keg agent, provided, however that nothing herein shall prevent Brewer from purchasing or renting kegs from a third-party in the event Global Keg is unable to meet Brewer's order requirements, and expressly waives any and all liens (including, without limitation, warehousemen's liens), security interests or any other legal or equitable claims of title to the Kegs or IT Property and shall indemnify Global Keg from and against any such claims by third parties arising out of Brewer's possession or use of the Kegs or IT Property. Upon request, Brewer shall execute any documents necessary to acknowledge, publish, file and record this Agreement and the rights of Global Keg under this Agreement.

The Kegs shall always carry Global Keg identification marks such as the Global Keg logo, telephone number, bar code label and RFID tag (utilizing Discrete Tracking Number). Brewer agrees not to remove or deface the Global Keg logo or telephone number in any manner. Brewer also agrees not to disable, remove or otherwise render inoperable the bar code label or the RFID tag.

If Brewer defaces Kegs or damages Global Keg IT Property, Brewer shall reimburse Global Keg for the cost of returning the Keg to its original condition (up to and including replacing the Keg) and repairing or replacing damaged IT Property.

The terms of Brewer's use of any software included in the IT Property are governed by the Software License attached to this Agreement as Appendix 2.



 GLOBAL KEG ASSET RENTAL AGREEMENT

6.  **Term and Termination**

This Agreement shall have a one (1) year term and will automatically renew on the first anniversary of the Agreement unless either of the Parties indicates in writing a desire to cancel or modify the Agreement giving a minimum of six (6) months' notice in advance of the expiry of the Agreement to the other Party.

   A.  Either Party may terminate this Agreement immediately by written notice if (i) bankruptcy or insolvency proceedings are brought by or against either Party, or either Party makes an arrangement with its creditors, or a receiver or administrator is appointed over any of its assets, or either Party goes into liquidation or is wound up, or either Party is subject to any other similar procedure.

   B.  In the unlikely event of a material breach of a provision of this Agreement by either Party, the other Party shall have the right to terminate the Agreement immediately (i) if the material breach cannot be cured, or (ii) if the material breach remains uncured forty-five (45) days subsequent to the receipt of written notice of the material breach.

   C.  Brewer must return all Kegs and IT property to Global Keg on or before thirty (30) days following termination of this Agreement in accordance with this Agreement. Any Kegs not returned to Global Keg within that period shall be subject to a replacement fee of €100 per Keg.

7.  **Limitation of Liability and Indemnity**

   A.  Neither Party shall be liable to the other for lost revenues or profits, or indirect, special, incidental, punitive or consequential damages regardless of legal theory or foreseeability.

   B.  Subject to paragraph 7.A, Brewer will indemnify Global Keg, its agents and employees against all losses, costs and damages (including reasonable attorneys' fees and expenses) which they may incur as a result of (i) any claims or suits against Global Keg, its agents and employees arising from the use of the Kegs by Brewer or any third party acting on behalf, or at the direction, of Brewer when such use is in breach of the terms of this Agreement (including, but not limited to, use that is not in accordance with the handling guidelines of Global Keg or is due to or arising out of any defect, failure, or misuse of any racking or handling equipment), and (ii) any material breach of this Agreement by Brewer. The provisions of this paragraph 7.B will survive the termination or expiration of this Agreement.

   C.  Subject to paragraph 7.A, Global Keg will indemnify Brewer, its agents and employees from and against all losses, costs and damages (including reasonable attorneys' fees and expenses) arising from or related to any negligence, willful misconduct or material breach of this Agreement by Global Keg. The provisions of this paragraph 7.C will survive the termination or expiration of this Agreement.

8.  **Confidentiality**

Confidential Information means (a) any business or technical information of Global Keg or Brewer, including but not limited to any information relating to either Party's products, services, prices, marketing plans, business opportunities, customers, or personnel, and (b) any other information of Global Keg or Brewer that is specifically designated by the disclosing Party as confidential or proprietary. Confidential Information shall not include information that (i) is in or enters the public domain without breach of this Agreement by the receiving Party, (ii) was demonstrably in the possession of the receiving Party prior to first receiving it from the disclosing Party without restriction on disclosure, (iii) the receiving Party can demonstrate was developed by the receiving Party independently and without use of or reference to the disclosing Party's Confidential Information, or (iv) the receiving Party receives from a third party without restriction on disclosure and without breach of a nondisclosure obligation. Each Party shall maintain the Confidential Information of the other Party in strict confidence until such time as the Confidential Information falls under one of the exceptions listed in items (i) through (iv) above. Each Party shall exercise no less than reasonable care with respect to the handling and protection of such Confidential Information. Each Party shall use the Confidential Information of the other Party only to perform its obligations under this Agreement, and shall disclose such Confidential Information only to its employees and independent contractors who are subject to binding use and disclosure restrictions at



 GLOBAL KEG ASSET RENTAL AGREEMENT

least as protective as those set forth herein and only as is reasonably required in connection with the exercise of its rights and obligations under this Agreement. Notwithstanding the above, the receiving Party may disclose Confidential Information of the disclosing Party pursuant to a valid order or requirement of a court or government agency, provided that the receiving Party gives prompt notice to the disclosing Party upon receiving the order or learning of the requirement. Any such disclosure by the receiving Party of the Confidential Information of the disclosing Party, shall, in no way, be deemed to change, affect or diminish the confidential status of such Confidential Information.

9. <u>Designated Representative</u>

Brewer's Designated Representative and the address, phone number, facsimile number and email address for notice to the Designated Representative as well as the email address to which electronic invoices should be directed are:

| Designated Representative: | Name | def versele |
|---|---|---|
| Address: | Address | lindenlaan 25 |
| Phone No: | Phone | 09 34450 71 |
| Facsimile No: | Fax (if applicable) | |
| Contact Email Address: | Main contact | jef @ vansteenberge.com |
| Email Address for Delivery of Electronic Invoices: | Invoice contact | sarah @ vansteenberge.com |

10. <u>Headings</u> The headings in this Agreement are inserted for convenience only and shall not affect the construction or interpretation of this Agreement.

11. <u>Applicable Law, Arbitration</u> This Agreement shall be deemed to be made under, and to be governed by, the laws of the State of Florida in the United States.

12. <u>Waiver</u> A waiver by either Party of any term or condition of this agreement in any instance shall not be deemed or construed to be a waiver of such term or condition for the future, or any subsequent breach thereof.

13. <u>Severability</u> If any provision of this Agreement is determined to be invalid, illegal, or unenforceable to any extent by an arbitrator or court of competent jurisdiction, that provision shall be construed as though more narrowly drawn if a narrower construction would avoid invalidity, illegality, or unenforceability, or if that is not possible, such provision shall be severed and the remaining provisions of this Agreement shall remain in effect.

14. <u>Assignment</u> Neither Party shall have the right to assign, transfer and/or sublicense its rights and/or duties and obligations arising under this Agreement, either in whole or in part, without the prior written consent of the other Party, such consent not to be unreasonably withheld, conditioned and/or delayed.

15. <u>Exclusivity of Arrangements</u> During the term of the Agreement, Brewer shall not conclude or enter into any agreement or understanding with any third-party regarding the lease, rental or licensing of any kegs for use in Brewer's business without prior written consent from Global Keg.

16. <u>Entire Understanding</u> This Agreement constitutes the whole and entire agreement of the Parties with respect to the subject matter of this Agreement, and it shall not be modified or amended in any respect except by a written instrument executed by both Parties. This Agreement replaces and supersedes all prior agreement whether written or oral between the parties with respect to the subject matter herein.



 GLOBAL KEG ASSET RENTAL AGREEMENT

17.  Counterparts This Agreement may be executed in counterparts, each of which will be deemed an original Agreement for all purposes and which collectively will constitute one and the same Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

By:   Brouwerij Van Steenberge

Name, Title

By: GLOBAL KEG RENTAL, LLC

Bobby L. Moore, Chief Executive

# EXHIBIT D

 GLOBAL KEG ASSET RENTAL AGREEMENT

**THIS ASSET RENTAL AGREEMENT** (the "Agreement") is made on **06.12.2019** ("Effective Date") between Global Keg Rental LLC, a Nevada limited liability company ("Global Keg") located at 6675 Westwood Blvd, Orlando, Florida 32821 and Schneider Weisse G. Schneider & Sohn GmbH ("Brewer"), located at Emil-Ott-Strasse 1-5, 93309 Kelheim.

1  Purpose of Agreement

This Agreement defines the legal and commercial relationship between Global Keg and Brewer and specifies the parties' responsibilities in relation to the rental and use of Global Keg's kegs (the "Kegs"). Brewer agrees to use the Kegs in accordance with the terms of this Agreement and its appendices. Commencing on the Effective Date, Brewer may begin to use Kegs for product filling and subsequent shipment to customers (distributors, wholesalers and retailers).

2  Global Keg's Responsibilities

Global Keg agrees that it will:

A.  Rent Kegs to Brewer at the pricing and other terms as set forth in Appendices hereto.

B.  Provide accurate and timely invoices.

C.  Inspect and clean the exterior of all Kegs and ensure all Kegs are serviceable and **"fit for use"** per the quality guidelines referenced in Appendix 3.

D.  Provide technical and information management services for all Kegs, as agreed with Brewer. Credit Brewer for fees charged for any Keg that is found to be not fit for use or contains defects in material and/or workmanship, except as caused by Brewer's or its agents' or employees' negligence or misuse.

E.  Furnish Brewer with Scan equipment or Scan software and maintain Scan equipment or software to facilitate Scanning.

F.  Furnish Brewer with a regular suite of reports with important data regarding the movement of the Kegs and the associated product data.

G.  Global Keg will manage the reverse logistics and collection of empty Kegs with Brewer's customers

3  Brewer's Responsibilities

Brewer agrees that it will:

A.  Use Kegs in accordance with established industry handling standards consistent with those standards currently in place at Brewer.

B.  Accept deliveries of Kegs from Global Keg, as well as from other Global Keg customers, Global Keg Reclamation Centers and Global Keg 3PL Warehouses, all of which will be subject to the terms of this Agreement.

C.  Not use any Kegs that it finds to be defective, damaged or unfit for use, and separate any keg it finds to be defective, damaged, or unfit for use for collection in a reasonable time frame by Global Keg who will be notified of said defect in order to promptly repair or replace.

D.  Acknowledge and agree that (i) Each Keg is of a size and capacity ordered by Brewer, (ii) Brewer is satisfied that each Keg rented pursuant to this Agreement is suitable for its purpose, and (iii) Global Keg rents out each Keg according to Global Keg quality guidelines, as set forth in Appendix attached hereto. Once the Kegs have been delivered and accepted by Brewer, Global Keg makes no warranty or representation, either express or implied, as to the fitness of the Kegs for any particular purpose while filled, under load or otherwise.

GLOBAL KEG

GLOBAL KEG ASSET RENTAL AGREEMENT

Promptly and accurately Scan and electronically report all Receipts, Fills and Transfers of Kegs to Global Keg.

Clean and sanitize the Kegs in accordance with industry standards before filling with product.

Upon filling a Keg, transmit Brewer supplied Keg content information to include "Sell-by-Date" and Brewer's "SKU" identifiers electronically using optical or RFID Scanning technology supplied by Global Keg or Brewer or combination thereof.

Pay Global Keg invoices in accordance with the terms agreed between Global Keg and Brewer.

From time to time and with proper notice allow Global Keg and its agents and employees access to Brewer's premises and vehicles (and premises and vehicles under Brewer's control) during business hours to conduct inventory of the Kegs and IT Property, inspect the condition and location of any Kegs and IT Property and verify Brewer's compliance with the terms of this Agreement, industry accepted keg handling standards and current Brewer handling, cleaning, and use practices.

Transfer Kegs only to locations agreed to by Global Keg and Brewer that are permitted to possess Kegs. The list of locations authorized to receive Global Keg kegs will be updated on an as needed basis.

As of the Effective Date, Brewer can Transfer Kegs only to countries listed in the Appendices. For Transfers to any other country, Brewer will notify and seek approval in advance, in writing, from Global Keg on a country by country basis.

Brewer will provide electrical and network access as required to install and operate Global Keg data capture and transmission devices and computers.

Brewer will provide ship to data and other reporting from time to time to facilitate Scan reconciliation of Keg movements.

Rental Charges and Payment

The parties agree to the rental and other terms, as set forth in Appendices concerning the rental of Kegs and Global Keg provided pallets.

Invoices for the rental of Kegs may contain the following separate main charges: Issue Fee, Pallet Fee, Keg Deposit and any applicable taxes.

If Brewer does not follow the Global Keg handling and Scanning procedures, then there are potential further charges which could be included in an invoice. Such as, the Do-Not-Ship Fee, Destroyed Keg Fee and Lost Keg Fee. Subsequent additional charges may be included and agreed to from time to time.

All the relevant recurring charges are described as follows:

**Issue Fee** - One-time charge for each Keg charged upon receipt of Keg by Brewer set forth in Appendices.

**Pallet Fee** - A charge for the provision of each pallet in the shipment of Kegs to Brewer set forth in Appendices.

**Lost Keg Fee** - Specific charge for the loss of any Keg which is only assessed under certain circumstances set forth in Appendices.

**If the Brewer Scans and Transfers to an authorized Global Keg receiver, Brewer will not be liable for any Lost Keg Fees.**

**Keg Deposit** - One-time deposit charged for the Transfer of a Keg to an authorized location by Brewer, to be returned or refunded once the Keg is returned to a Global Keg Reclamation Center undamaged and intact set forth in Appendices.

GL⊘BAL KEG

**Do Not Ship Fee** - One-time charge for the Transfer of a Keg to any location outside of approved locations or countries set forth in Appendices.

**Destroyed Keg Fee** – One-time charge to Brewer for abusing the Keg while under direct Brewer control such that it has sustained structural or other heavy damage so that it cannot be re-deployed set forth in Appendices.

**Fuel Surcharge** – A charge to Brewer per Keg if fuel prices of the average per gallon cost of diesel fuel increases

**Inactivity Fee** - Recurring charge for Kegs not Scanned or Transferred to an authorized location within a specific time period.

E.   All charges, except for deposits, including all applicable taxes (sales, use, personal property, service or similar) and any other charges required by law, shall accrue daily and be payable within Thirty (30) days from the date of the invoice. Deposits shall be due and payable upon receipt of invoice.

A late fee of 1.5% per month will be assessed on all invoices not paid within Ten (10) days of the invoice due date

8.   Restrictions on Use of Global Keg Property

The Kegs and IT Property shall at all times remain the exclusive property of Global Keg. Brewer has no right to sell or deal with the Kegs or IT Property in any way that is inconsistent with ownership of the Kegs and IT Property by Global Keg. Brewer hereby agrees not to purchase or rent Global Keg Kegs from any source other than Global Keg or an authorized Global Keg agent, provided, however that nothing herein shall prevent Brewer from purchasing or renting kegs from a third-party in the event Global Keg is unable to meet Brewer's order requirements, and expressly waives any and all liens (including, without limitation, warehousemen's liens), security interests or any other legal or equitable claims of title to the Kegs or IT Property and shall indemnify Global Keg from and against any such claims by third parties arising out of Brewer's possession or use of the Kegs or IT Property. Upon request, Brewer shall execute any documents necessary to acknowledge, publish, file and record this Agreement and the rights of Global Keg under this Agreement.

The Kegs shall always carry Global Keg identification marks such as the Global Keg logo, telephone number, bar code label and RFID tag (utilizing Discrete Tracking Number). Brewer agrees not to remove or deface the Global Keg logo or telephone number in any manner. Brewer also agrees not to disable, remove or otherwise render inoperable the bar code label or the RFID tag.

If Brewer defaces Kegs or damages Global Keg IT Property, Brewer shall reimburse Global Keg for the cost of returning the Keg to its original condition (up to and including replacing the Keg) and repairing or replacing damaged IT Property.

The terms of Brewer's use of any software included in the IT Property are governed by the Software License attached to this Agreement as Appendix 2.



GLOBAL KEG ASSET RENTAL AGREEMENT

6.    Term and Termination

This Agreement shall have a one (1) year term and will automatically renew on the first anniversary of the Agreement unless either of the Parties indicates in writing a desire to cancel or modify the Agreement giving a minimum of three (3) months' notice in advance of the expiry of the Agreement to the other Party.

A.    Either Party may terminate this Agreement immediately by written notice if (i) bankruptcy or insolvency proceedings are brought by or against either Party, or either Party makes an arrangement with its creditors, or a receiver or administrator is appointed over any of its assets, or either Party goes into liquidation or is wound up, or either Party is subject to any other similar procedure.

B.    In the unlikely event of a material breach of a provision of this Agreement by either Party, the other Party shall have the right to terminate the Agreement immediately (i) if the material breach cannot be cured, or (ii) if the material breach remains uncured forty-five (45) days subsequent to the receipt of written notice of the material breach.

C.    Brewer must return all Kegs and IT property to Global Keg on or before thirty (30) days following termination of this Agreement in accordance with this Agreement. Any Kegs not returned to Global Keg within that period shall be subject to a replacement fee of €100 per Keg.

7.    Limitation of Liability and Indemnity

A.    Neither Party shall be liable to the other for lost revenues or profits, or indirect, special, incidental, punitive or consequential damages regardless of legal theory or foreseeability.

B.    Subject to paragraph 7.A, Brewer will indemnify Global Keg, its agents and employees against all losses, costs and damages (including reasonable attorneys' fees and expenses) which they may incur as a result of (i) any claims or suits against Global Keg, its agents and employees arising from the use of the Kegs by Brewer or any third party acting on behalf, or at the direction, of Brewer when such use is in breach of the terms of this Agreement (including, but not limited to, use that is not in accordance with the handling guidelines of Global Keg or is due to or arising out of any defect, failure, or misuse of any racking or handling equipment), and (ii) any material breach of this Agreement by Brewer. The provisions of this paragraph 7.B will survive the termination or expiration of this Agreement.

C.    Subject to paragraph 7.A, Global Keg will indemnify Brewer, its agents and employees from and against all losses, costs and damages (including reasonable attorneys' fees and expenses) arising from or related to any negligence, willful misconduct or material breach of this Agreement by Global Keg.    The provisions of this paragraph 7.C will survive the termination or expiration of this Agreement.

8.    Confidentiality

Confidential Information means (a) any business or technical information of Global Keg or Brewer, including but not limited to any information relating to either Party's products, services, prices, marketing plans, business opportunities, customers, or personnel, and (b) any other information of Global Keg or Brewer that is specifically designated by the disclosing Party as confidential or proprietary. Confidential Information shall not include information that (i) is in or enters the public domain without breach of this Agreement by the receiving Party, (ii) was demonstrably in the possession of the receiving Party prior to first receiving it from the disclosing Party without restriction on disclosure, (iii) the receiving Party can demonstrate was developed by the receiving Party independently and without use of or reference to the disclosing Party's Confidential Information, or (iv) the receiving Party receives from a third party without restriction on disclosure and without breach of a nondisclosure obligation. Each Party shall maintain the Confidential Information of the other Party in strict confidence until such time as the Confidential Information falls under one of the exceptions listed in items (i) through (iv) above. Each Party shall exercise no less than reasonable care with respect to the handling and protection of such Confidential Information. Each Party shall use the Confidential Information of the other Party only to perform its obligations under this Agreement, and shall disclose such Confidential Information only to its employees and independent contractors who are subject to binding use and disclosure restrictions at

GLOBAL KEG ASSET RENTAL AGREEMENT

least as protective as those set forth herein and only as is reasonably required in connection with the exercise of its rights and obligations under this Agreement. Notwithstanding the above, the receiving Party may disclose Confidential Information of the disclosing Party pursuant to a valid order or requirement of a court or government agency, provided that the receiving Party gives prompt notice to the disclosing Party upon receiving the order or learning of the requirement. Any such disclosure by the receiving Party of the Confidential Information of the disclosing Party, shall, in no way, be deemed to change, affect or diminish the confidential status of such Confidential Information.

9    Designated Representative

Brewer's Designated Representative and the address, phone number, facsimile number and email address for notice to the Designated Representative as well as the email address to which electronic invoices should be directed are:

| | |
|---|---|
| Designated Representative: | Hans-Peter Drexler |
| Address: | Emil-Ott-Strasse 1-5, 93309 Kelheim |
| Phone No: | +49 9441 705 150 |
| Facsimile No: | +49 9441 705 10150 |
| Contact Email Address: | hans-peter.drexler@schneider-weisse.de |
| Email Address for Delivery of Electronic Invoices: | franz.rackwitz@schneider-weisse.de |

10    Headings The headings in this Agreement are inserted for convenience only and shall not affect the construction or interpretation of this Agreement.

11.    Applicable Law, Arbitration This Agreement shall be deemed to be made under, and to be governed by German substantive Law.

All disputes arising out of or in connection with the present Contract shall be finally settled without recourse to the courts in accordance with the Rules of Arbitration of the International Chamber of Commerce, Paris (ICC) by one or more arbitrators appointed in conformity with the said Rules. The losing Party, as determined by the arbitrators, shall pay all expenses incurred by the prevailing Party, as determined by the arbitrators in connection with any such dispute. Place of arbitration shall be 90429 Nürnberg, Germany.

12    Waiver A waiver by either Party of any term or condition of this agreement in any instance shall not be deemed or construed to be a waiver of such term or condition for the future, or any subsequent breach thereof.

13.    Severability If any provision of this Agreement is determined to be invalid, illegal, or unenforceable to any extent by an arbitrator or court of competent jurisdiction, that provision shall be construed as though more narrowly drawn if a narrower construction would avoid invalidity, illegality, or unenforceability, or if that is not possible, such provision shall be severed and the remaining provisions of this Agreement shall remain in effect.

14.    Assignment Neither Party shall have the right to assign, transfer and/or sublicense its rights and/or duties and obligations arising under this Agreement, either in whole or in part, without the prior written consent of the other Party, such consent not to be unreasonably withheld, conditioned and or delayed.

GLOBAL KEG

GLOBAL KEG MASTER RENTAL AGREEMENT

5.   Exclusivity of Arrangements During the term of the Agreement, Brewer shall not conclude or enter into any agreement or understanding with any third-party regarding the lease, rental or licensing of any kegs for use in Brewer's business without prior written consent from Global Keg.

6.   Entire Understanding This Agreement constitutes the whole and entire agreement of the Parties with respect to the subject matter of this Agreement, and it shall not be modified or amended in any respect except by a written instrument executed by both Parties. This Agreement replaces and supersedes all prior agreement whether written or oral between the parties with respect to the subject matter herein.

7.   Counterparts This Agreement may be executed in counterparts, each of which will be deemed an original Agreement for all purposes and which collectively will constitute one and the same Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

By:    Schneider Weisse G. Schneider & Sohn GmbH

_____
Hans-Peter Drexler, Geschäftsführer Technik/Logistik

By: GLOBAL KEG RENTAL, LLC

_____
Bobby L. Moore, Chief Executive

GL3BAL KEG                    GLOBAL KEG ASSET RENTAL AGREEMENT

## APPENDIX 1

### CHARGES FOR USE OF GLOBAL KEG KEGS

- All pricing in Appendix 1 is denominated in € (Euro).

- Issue Fees are based on minimum orders of at least 4 unit loads per order (a unit load is minimum of 3 pallets high).

- Issue Fees will be assessed at the Domestic Issue Fee price upon shipment of Kegs to Brewer. The remaining Issue Fee balance owed will be invoiced at the time of Transfer based on shipment to the Geographic Zone shipped to. Any shipment to a Distributor/Importer must be approved and agreed to in writing by Global Keg in advance of shipment or be subject to a **Do Not Ship Fee**.

| SUMMARY OF ISSUE FEES IN € EURO BY GEOGRAPHIC ZONE | | | |
|---|---|---|---|
| Issue Fee Types | 50L - 1/2bbl | 30L - 1/4bbl | 20L - 1/6bbl | Description |
| Domestic | 9.50 | 8.50 | 7.50 | Transfer of a Keg where the Keg is shipped direct to Retail or to a Distributor based in Brewers own country |
| European | 13.00 | 11.75 | 10.50 | Transfer of a Keg to a Distributor/Importer located in Europe (within the EU) |
| North American | 14.60 | 13.70 | 11.60 | Transfer of a Keg to a Distributor/Importer located in the USA or Canada |
| Asian | 15.80 | 15.00 | 13.30 | Transfer of a Keg to a Distributor/Importer located in Asia |
| Australasian | 15.80 | 15.00 | 13.30 | Transfer of a Keg to a Distributor/Importer located in Australia/New Zealand |
| South American | 15.80 | 15.00 | 13.30 | Transfer of a Keg to a Distributor/Importer located in South America |
| Exceptional Logistics | 7.50 | 16.20 | 15.00 | Any Transfer of a Keg to a country with exceptional reverse logistics costs (e.g. Kazakhstan). |

A deposit on each Keg will also be assessed if appropriate, as per section 8 of Appendix 1.
The costs above represent the total charges Brewer owes Global Keg for filling a rental keg.

- A one-time **Implementation Deposit** of €4,000 will be charged per Brewer to provide a scanning solution to enable Brewer to Scan Kegs and must be paid before install begins and Kegs ship to Brewer. This Deposit will be refundable once all Global Keg assets have been returned in good working order to Global Keg and all outstanding invoices and fees paid. Any owed amounts by Brewer to Global Keg may be withheld from this deposit.

GL⊘BAL KEG

### GLOBAL KEG ASSET RENTAL AGREEMENT

6.  If the shipment of Kegs to Brewer are palletized loads, then a **Pallet Fee** of € 10 will be charged for each way and return load pallet.

7.  Lost Keg Fee will result when a keg is deemed by Brewer to be lost while under their direct control and a flat fee of €85 on a Half Barrel 50L, €85 on a Quarter Barrel 30L and €75 on a Sixth Barrel 20L, for each Keg is to be charged to Brewer. For the avoidance of doubt, a Keg is under the direct control of Brewer from the moment it is Scanned in on delivery to the brewery to the moment it is Scanned out to an authorized receiver. A Lost Keg Fee will also result if a Keg is transferred to an authorized receiver and Global Keg is not electronically notified within 90 days per the requirements of Section 3, "Brewer's Responsibilities". For any Keg that was previously charged to the Brewer as 'lost' and is subsequently located by Global Keg, the Lost Keg Fee will be credited to the Brewer less any applicable fees. Once the keg has been **Scanned and Transferred to an authorized Global Keg receiver, Brewer will not be liable for any Lost Keg Fees.**

7.  An **Inactivity Fee** per Keg, equivalent to the Local or Domestic Issue Fee, will be charged in the event that Kegs requested to be delivered to Brewer (or any third-party owned brewing facilities utilized by Brewer) are not Scanned and Transferred to a Wholesaler/Distributor/Importer or Retailer within forty five (45) days from date of issue and each subsequent forty five day (45) period or utilized in relation to other sales contemplated by this Agreement.

8.  Global Keg will charge Brewer a base Keg Deposit on all Kegs issued to Brewer which will be payable on receipt. As an example, but not limited to, USD $30 US in the U.S.A., CAD $50 in Canada, GBP £30 in the UK, EUR €30 in most European countries, YEN ¥3,000 in Japan, AUD $45 in Australia, etc. Brewer is responsible for recouping this deposit charge from its Wholesaler/Distributor/Importer or Retailer. Once the empty Keg has been Scanned in and returned to a Global Keg Reclamation Center undamaged and intact, Global Keg will return the deposit it collected from the Brewer to the Wholesaler/Distributor/Importer/Retailer in the same amount and currency value collected by Global Keg.

    **Higher Deposit Market**
    Once the Keg is Scanned and Transferred to an Authorized Global Keg Receiver if the deposit amount applicable is higher for that country or location the keg is Transferred to Global Keg will charge the incremental difference but never refund or credit an amount below the original deposit charged.

9.  In the case of a shipment to any receiver not pre-approved by Global Keg, Brewer will be charged a **Do Not Ship Fee** of €95. The Do-Not-Ship Fee will be credited back to Brewer if, at any time, the Keg for which Brewer has paid such charge is identified by Discrete Tracking Number and located anywhere at a Global Keg authorized location.

10. A **Destroyed Keg Fee** of €95 will be charged to Brewer for abusing the Keg while in Brewer control such that it has sustained structural damage or such other heavy damage that it cannot be re-deployed.

11. If Brewer rents less than 200 kegs average in a calendar month, all kegs issued in that month will be invoiced at the highest Issue Fee available.

12. A keg requirement Annual Forecast must be provided to Global Keg both when initiating business (via the brewery profile) and by September 1st each year outlining the anticipated monthly keg rental requirements by Keg size, valve type and use category for the subsequent year. In the event that the quantity of Kegs to be delivered in a particular calendar quarter is less than 85% of the Brewer's annual forecasted quantity by quarter, Brewer may be charged the difference of actual quantity ordered versus the forecasted quantity up to 85% of the aggregate estimated fees for that quarter as a **Forecast Commitment** for the quantity of Kegs based on the Keg sizes, valve types and use categories forecast. In case Global Keg does not as a minimum deliver 85 % of the yearly forecasted volumes per quarter per kegsize the liability is mutual and Global Keg may be charged the equivalent of the issue fees for the non-delivered kegs upto these 85 % of the quarterly forecasted volumes.

13. Orders must be made at least ten (10) business days prior to the requested delivery date. Orders must be materially similar to the forecasted volumes although Global Keg will always do its utmost to meet Brewer's needs. Orders of less than ten (10) business days prior to the requested delivery date are "Emergency Orders" and are and will include an additional expedite fee on a "pass through" basis subject to Global Keg approval and Brewer acceptance.

14. Orders for Kegs cancelled within five (5) business days where the Kegs have already been shipped will be assessed a [illegible] cancellation fee plus actual costs incurred by Global Keg for shipment of that order.

15. Brewer is responsible for any international brokerage fees, tariffs or taxes.

GLOBAL Keg

GLOBAL KEG ASSET RENTAL AGREEMENT

## APPENDIX 2

### SOFTWARE LICENSE

Background

Global Keg owns and/or has been granted licenses from third party software companies to use and to sublicense to Global Keg's customers and service providers certain software for use in connection with the rental and use of the Kegs. This Appendix to the Agreement sets forth the terms and conditions by which Global Keg grants to Brewer a license or sublicense to such software and other software that Global Keg may provide to Brewer in connection with the storage and handling of any Kegs.

> Global Keg grants to Brewer, during the term of the Agreement, a non-exclusive license or sublicense, as the case may be, to use the Software solely in connection with the use, storage and handling of the Kegs in accordance with the Agreement, and for no other purpose.

> Global Keg will either:
> - Provide software for installation on existing hardware (i.e. customer owned Scanning devices, computers, tablets or smart phones) at no additional cost to Brewer; and/or
> - Provide hardware and equipment, including RFID and/or barcode Scanners and associated equipment intended specifically for the Scanning of the Kegs' Discrete Tracking Numbers and the related data concerning the product within the Keg, its destination, expiry, etc. at no additional cost to Brewer.

> Global Keg will own, maintain and service said provided equipment and software for the life of this Agreement and subsequent future Agreements. Provision of said software or equipment is at Global Keg's complete discretion.

> Brewer will follow recommended practices and guidelines and provide proper care for Global Keg provided equipment as specified in applicable user guides.

> Where available and agreed by both parties, Global Keg will facilitate software integration and Brewer agrees to develop an approved software integration solution with existing Manufacturing/Shipping/Warehouse Management Systems (i.e. Route Accounting, Red Prairie, SAP, etc.). Brewer will make the necessary modifications to management systems to allow for integration of the Global Keg Discrete Tracking Numbers to be associated with their respective product or shipping identifiers at Global Keg's cost. These associated identifiers and the Global Keg Discrete Tracking Number record is then utilized to electronically inform Global Keg of the current whereabouts, transfer or movement of each discrete Keg to a downstream location (i.e. Wholesaler, Distributor, or Retailer).

## Appendix 3

### GLOBAL KEG QUALITY GUIDELINES

- Kegs will ship to Brewer stripped of any obvious non-Global Keg external markings (stickers, tax discs etc.) and drained of more than 70 % of liquid.
- Kegs will ship to Brewer unitized on a pallet.
- Kegs will ship to Brewer with an intact valve that does not leak.
- Kegs will ship to Brewer with no substantial structural damage to the chime or Keg body

If any Kegs are shipped that do not meet these criteria, Global Keg will credit Brewer C10 per keg and replace or repair damaged Kegs at Global Keg's own cost.

# EXHIBIT E



**GLOBAL KEG ASSET RENTAL AGREEMENT**

**THIS ASSET RENTAL AGREEMENT** (the "**Agreement**") is made on _____ 2018 ("**Effective Date**") between **Global Keg Rental LLC, a Nevada limited liability company** ("**Global Keg**") located at **6675 Westwood Blvd, Orlando, Florida 32821** and ~~Stiegl Getränke & Service GmbH & Co. KG~~ ("**Brewer**"), located at **A-5017 Salzburg, Kendlerstraße 1, Austria.**

<div align="center">

**STIEGLBRAUEREI**
zu Salzburg GmbH
A-5017 Salzburg · Kendlerstraße 1
Tel. +43 (0) 50 · 1492 · 0

</div>

1.  Purpose of Agreement

This Agreement defines the legal and commercial relationship between Global Keg and Brewer and specifies the parties' responsibilities in relation to the rental and use of Global Keg's kegs (the "**Kegs**"). Brewer agrees to use the Kegs in accordance with the terms of this Agreement and its appendices. Commencing on the Effective Date, Brewer may begin to use Kegs for product filling and subsequent shipment to customers (distributors, wholesalers and retailers).

2.  Global Keg's Responsibilities

Global Keg agrees that it will:

A.  Rent Kegs to Brewer at the pricing and other terms as set forth in Appendices hereto.

B.  Provide accurate and timely invoices.

C.  Inspect and clean the exterior of all Kegs and ensure all Kegs are serviceable and "**fit for use**" per the quality guidelines referenced in Appendix 3.

D.  Provide technical and information management services for all Kegs, as agreed with Brewer. Credit Brewer for fees charged for any Keg that is found to be not fit for use or contains defects in material and/or workmanship, except as caused by Brewer's or its agents' or employees' negligence or misuse.

E.  Furnish Brewer with Scan equipment or Scan software and maintain Scan equipment or software to facilitate Scanning.

F.  Furnish Brewer with a regular suite of reports with important data regarding the movement of the Kegs and the associated product data.

G.  Global Keg will manage the reverse logistics and collection of empty Kegs with Brewer's customers.

3.  Brewer's Responsibilities

Brewer agrees that it will:

A.  Use Kegs in accordance with established industry handling standards consistent with those standards currently in place at Brewer.

B.  Accept deliveries of Kegs from Global Keg, as well as from other Global Keg customers, Global Keg Reclamation Centers and Global Keg 3PL Warehouses, all of which will be subject to the terms of this Agreement.

C.  Not use any Kegs that it finds to be defective, damaged or unfit for use, and separate any keg it finds to be defective, damaged, or unfit for use for collection in a reasonable time frame by Global Keg who will be notified of said defect in order to promptly repair or replace.

D.  Acknowledge and agree that (i) Each Keg is of a size and capacity ordered by Brewer, (ii) Brewer is satisfied that each Keg rented pursuant to this Agreement is suitable for its purpose, and (iii) Global Keg rents out each Keg according to Global Keg quality guidelines, as set forth in Appendix attached hereto. Once the Kegs have been delivered and accepted by Brewer, Global Keg makes no warranty or representation, either express or implied, as to the fitness of the Kegs for any particular purpose while filled, under load or otherwise.

 **GLOBAL KEG ASSET RENTAL AGREEMENT**

    E.    Promptly and accurately Scan and electronically report all Receipts, Fills and Transfers of Kegs to Global Keg.

    F.    Clean and sanitize the Kegs in accordance with industry standards before filling with product.

    G.    Upon filling a Keg, transmit Brewer supplied Keg content information to include "Sell-by-Date" and Brewer's "SKU" identifiers electronically using optical or RFID Scanning technology supplied by Global Keg or Brewer or combination thereof.

    H.    Pay Global Keg invoices in accordance with the terms agreed between Global Keg and Brewer.

    I.    From time to time and with proper notice allow Global Keg and its agents and employees access to Brewer's premises and vehicles (and premises and vehicles under Brewer's control) during business hours to conduct inventory of the Kegs and IT Property, inspect the condition and location of any Kegs and IT Property and verify Brewer's compliance with the terms of this Agreement, industry accepted keg handling standards and current Brewer handling, cleaning, and use practices.

    J.    Transfer Kegs only to locations agreed to by Global Keg and Brewer that are permitted to possess Kegs. The list of locations authorized to receive Global Keg kegs will be updated on an as needed basis.

    K.    As of the Effective Date, Brewer can Transfer Kegs only to countries listed in the Appendices. For Transfers to any other country, Brewer will notify and seek approval in advance, in writing, from Global Keg on a country by country basis.

    L.    Brewer will provide electrical and network access as required to install and operate Global Keg data capture and transmission devices and computers.

    M.    Brewer will provide ship to data and other reporting from time to time to facilitate Scan reconciliation of Keg movements.

4.    <u>Rental Charges and Payment</u>

    A.    The parties agree to the rental and other terms, as set forth in Appendices concerning the rental of Kegs and Global Keg provided pallets.

    B.    Invoices for the rental of Kegs may contain the following separate main charges: Issue Fee, Pallet Fee, Keg Deposit and any applicable taxes.

    C.    If Brewer does not follow the Global Keg handling and Scanning procedures, then there are potential further charges which could be included in an invoice. Such as, the Do-Not-Ship Fee, Destroyed Keg Fee and Lost Keg Fee. Subsequent additional charges may be included and agreed to from time to time.

    D.    All the relevant recurring charges are described as follows:

    **Issue Fee** - One-time charge for each Keg charged upon receipt of Keg by Brewer set forth in Appendices.

    **Pallet Fee** - A charge for the provision of each pallet in the shipment of Kegs to Brewer set forth in Appendices.

    **Lost Keg Fee** - Specific charge for the loss of any Keg which is only assessed under certain circumstances set forth in Appendices.

    **If the Brewer Scans and Transfers to an authorized Global Keg receiver, Brewer will not be liable for any Lost Keg Fees.**

    **Keg Deposit** - One-time deposit charged for the Transfer of a Keg to an authorized location by Brewer, to be returned or refunded once the Keg is returned to a Global Keg Reclamation Center undamaged and intact set forth in Appendices.

 **GL⬡BAL** _keg_
_TAP INTO THE FUTURE_

### GLOBAL KEG ASSET RENTAL AGREEMENT

**Do Not Ship Fee** - One-time charge for the Transfer of a Keg to any location outside of approved locations or countries set forth in Appendices.

**Destroyed Keg Fee** – One-time charge to Brewer for abusing the Keg while under direct Brewer control such that it has sustained structural or other heavy damage so that it cannot be re-deployed set forth in Appendices.

**Fuel Surcharge** – A charge to Brewer per Keg if fuel prices of the average per gallon cost of diesel fuel increases.

E. All charges, including all applicable taxes (sales, use, personal property, service or similar) and any other charges required by law, shall accrue daily and be payable within Thirty (30) days from the date of the invoice.

F. A late fee of 1.5% per month will be assessed on all invoices not paid within Ten (10) days of the invoice due date.

5. <u>Restrictions on Use of Global Keg Property</u>

The Kegs and IT Property shall at all times remain the exclusive property of Global Keg. Brewer has no right to sell or deal with the Kegs or IT Property in any way that is inconsistent with ownership of the Kegs and IT Property by Global Keg. Brewer hereby agrees not to purchase or rent Global Keg Kegs from any source other than Global Keg or an authorized Global Keg agent, provided, however that nothing herein shall prevent Brewer from purchasing or renting kegs from a third-party in the event Global Keg is unable to meet Brewer's order requirements, and expressly waives any and all liens (including, without limitation, warehousemen's liens), security interests or any other legal or equitable claims of title to the Kegs or IT Property and shall indemnify Global Keg from and against any such claims by third parties arising out of Brewer's possession or use of the Kegs or IT Property. Upon request, Brewer shall execute any documents necessary to acknowledge, publish, file and record this Agreement and the rights of Global Keg under this Agreement.

The Kegs shall always carry Global Keg identification marks such as the Global Keg logo, telephone number, bar code label and RFID tag (utilizing Discrete Tracking Number). Brewer agrees not to remove or deface the Global Keg logo or telephone number in any manner. Brewer also agrees not to disable, remove or otherwise render inoperable the bar code label or the RFID tag.

If Brewer defaces Kegs or damages Global Keg IT Property, Brewer shall reimburse Global Keg for the cost of returning the Keg to its original condition (up to and including replacing the Keg) and repairing or replacing damaged IT Property.

The terms of Brewer's use of any software included in the IT Property are governed by the Software License attached to this Agreement as Appendix 2.

 **GLOBAL KEG ASSET RENTAL AGREEMENT**

6.    Term and Termination

This Agreement shall have a one (1) year term and will automatically renew on the first anniversary of the Agreement unless either of the Parties indicates in writing a desire to cancel or modify the Agreement giving a minimum of six (6) months' notice in advance of the expiry of the Agreement to the other Party.

A.    Either Party may terminate this Agreement immediately by written notice if (i) bankruptcy or insolvency proceedings are brought by or against either Party, or either Party makes an arrangement with its creditors, or a receiver or administrator is appointed over any of its assets, or either Party goes into liquidation or is wound up, or either Party is subject to any other similar procedure.

B.    In the unlikely event of a material breach of a provision of this Agreement by either Party, the other Party shall have the right to terminate the Agreement immediately (i) if the material breach cannot be cured, or (ii) if the material breach remains uncured forty-five (45) days subsequent to the receipt of written notice of the material breach.

C.    Brewer must return all Kegs and IT property to Global Keg on or before thirty (30) days following termination of this Agreement in accordance with this Agreement.  Any Kegs not returned to Global Keg within that period shall be subject to a replacement fee of €100 per Keg.

7.    Limitation of Liability and Indemnity

A.    Neither Party shall be liable to the other for lost revenues or profits, or indirect, special, incidental, punitive or consequential damages regardless of legal theory or foreseeability.

B.    Subject to paragraph 7.A, Brewer will indemnify Global Keg, its agents and employees against all losses, costs and damages (including reasonable attorneys' fees and expenses) which they may incur as a result of (i) any claims or suits against Global Keg, its agents and employees arising from the use of the Kegs by Brewer or any third party acting on behalf, or at the direction, of Brewer when such use is in breach of the terms of this Agreement (including, but not limited to, use that is not in accordance with the handling guidelines of Global Keg or is due to or arising out of any defect, failure, or misuse of any racking or handling equipment), and (ii) any material breach of this Agreement by Brewer. The provisions of this paragraph 7.B will survive the termination or expiration of this Agreement.

C.    Subject to paragraph 7.A, Global Keg will indemnify Brewer, its agents and employees from and against all losses, costs and damages (including reasonable attorneys' fees and expenses) arising from or related to any negligence, willful misconduct or material breach of this Agreement by Global Keg.  The provisions of this paragraph 7.C will survive the termination or expiration of this Agreement.

8.    Confidentiality

Confidential Information means (a) any business or technical information of Global Keg or Brewer, including but not limited to any information relating to either Party's products, services, prices, marketing plans, business opportunities, customers, or personnel, and (b) any other information of Global Keg or Brewer that is specifically designated by the disclosing Party as confidential or proprietary.  Confidential Information shall not include information that (i) is in or enters the public domain without breach of this Agreement by the receiving Party, (ii) was demonstrably in the possession of the receiving Party prior to first receiving it from the disclosing Party without restriction on disclosure, (iii) the receiving Party can demonstrate was developed by the receiving Party independently and without use of or reference to the disclosing Party's Confidential Information, or (iv) the receiving Party receives from a third party without restriction on disclosure and without breach of a nondisclosure obligation. Each Party shall maintain the Confidential Information of the other Party in strict confidence until such time as the Confidential Information falls under one of the exceptions listed in items (i) through (iv) above. Each Party shall exercise no less than reasonable care with respect to the handling and protection of such Confidential Information. Each Party shall use the Confidential Information of the other Party only to perform its obligations under this Agreement, and shall disclose such Confidential Information only to its employees and independent contractors who are subject to binding use and disclosure restrictions at

 GLOBAL KEG ASSET RENTAL AGREEMENT

least as protective as those set forth herein and only as is reasonably required in connection with the exercise of its rights and obligations under this Agreement. Notwithstanding the above, the receiving Party may disclose Confidential Information of the disclosing Party pursuant to a valid order or requirement of a court or government agency, provided that the receiving Party gives prompt notice to the disclosing Party upon receiving the order or learning of the requirement. Any such disclosure by the receiving Party of the Confidential Information of the disclosing Party, shall, in no way, be deemed to change, affect or diminish the confidential status of such Confidential Information.

9.    Designated Representative

Brewer's Designated Representative and the address, phone number, facsimile number and email address for notice to the Designated Representative as well as the email address to which electronic invoices should be directed are:

| | |
|---|---|
| Designated Representative: | Michael Schmitzberger |
| Address: | A-5017 Salzburg, Kendlerstraße 1, Austria |
| Phone No: | +43 50 1492-2040 |
| Facsimile No: | ---------------- |
| Contact Email Address: | michael.schmitzberger@stiegl.at |
| Email Address for Delivery of Electronic Invoices: | rechnung.~~xxx~~@stiegl.at *STB* |

10.    Headings The headings in this Agreement are inserted for convenience only and shall not affect the construction or interpretation of this Agreement.

11.    Applicable Law, Arbitration This Agreement shall be deemed to be made under, and to be governed by, ~~the laws of the State of Florida in the United States.~~ Austrian Law with jurisdiction at an Austrian Court.

12.    Waiver A waiver by either Party of any term or condition of this agreement in any instance shall not be deemed or construed to be a waiver of such term or condition for the future, or any subsequent breach thereof.

13.    Severability If any provision of this Agreement is determined to be invalid, illegal, or unenforceable to any extent by an arbitrator or court of competent jurisdiction, that provision shall be construed as though more narrowly drawn if a narrower construction would avoid invalidity, illegality, or unenforceability, or if that is not possible, such provision shall be severed and the remaining provisions of this Agreement shall remain in effect.

14.    Assignment Neither Party shall have the right to assign, transfer and/or sublicense its rights and/or duties and obligations arising under this Agreement, either in whole or in part, without the prior written consent of the other Party, such consent not to be unreasonably withheld, conditioned and/or delayed.

15.    Exclusivity of Arrangements During the term of the Agreement, Brewer shall not conclude or enter into any agreement or understanding with any third-party regarding the lease, rental or licensing of any kegs for use in Brewer's business without prior written consent from Global Keg.

16.    Entire Understanding This Agreement constitutes the whole and entire agreement of the Parties with respect to the subject matter of this Agreement, and it shall not be modified or amended in any respect except by a written instrument executed by both Parties. This Agreement replaces and supersedes all prior agreement whether written or oral between the parties with respect to the subject matter herein.

 **GLOBAL KEG ASSET RENTAL AGREEMENT**

17.    <u>Counterparts</u> This Agreement may be executed in counterparts, each of which will be deemed an original Agreement for all purposes and which collectively will constitute one and the same Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

By:    ~~Stiegl Getränke & Service GmbH & Co. KG~~
       STIEGLBRAUEREI
       zu Salzburg GmbH
       A-5017 Salzburg · Kendlerstraße 1
       Tel. +43 (0) 50 - 1492 - 0
       _____
       Thomas Gerbl, CEO

By:    ~~Stiegl Getränke & Service GmbH & Co. KG~~
       STIEGLBRAUEREI
       zu Salzburg GmbH
       A-5017 Salzburg / Kendlerstraße 1
       Tel. +43 (0) 50 - 1492 - 0
       _____
       Christian Pöpperl, Head Brewmaster, CTO


By: GLOBAL KEG RENTAL, LLC

       _____
       Bobby L. Moore, Chief Executive

  GLOBAL KEG ASSET RENTAL AGREEMENT

### APPENDIX 1

### CHARGES FOR USE OF GLOBAL KEG KEGS

1.    All pricing in Appendix 1 is denominated in € (Euro).

2.    Issue Fees are based on **minimum orders of at least 4 unit loads per order (a unit load is 3 pallets high)**.

3.    Issue Fees will be assessed at the Domestic Issue Fee price upon shipment of Kegs to Brewer. The remaining Issue Fee balance owed will be invoiced at the time of Transfer based on shipment to the Geographic Zone shipped to. Any shipment to a Distributor/Importer not listed in Appendix 4 must be approved and agreed to in writing by Global Keg in advance of shipment or be subject to a **Do Not Ship Fee**.

| SUMMARY OF ISSUE FEES IN € EURO BY GEOGRAPHIC ZONE | | | | |
|---|---|---|---|---|
| **Issue Fee Types** | **50L** | **30L** | **20L** | **Description** |
| Domestic | 6.75 | 6.35 | 5.25 | Transfer of a Keg where the Keg is shipped direct to Retail or to a Distributor based in Brewers own country |
| European | 11.50 | 9.90 | 8.50 | Transfer of a Keg to a Distributor/Importer located in Europe (within the EU) |
| North American | 14.60 | 13.10 | 11.60 | Transfer of a Keg to a Distributor/Importer located in the USA or Canada |
| Asian | 15.80 | 15.00 | 13.30 | Transfer of a Keg to a Distributor/Importer located in Asia |
| Australasian | 15.80 | 15.00 | 13.30 | Transfer of a Keg to a Distributor/Importer located in Australia/New Zealand |
| South American | 15.80 | 15.00 | 13.30 | Transfer of a Keg to a Distributor/Importer located in South America |
| Other/Exceptional | 17.50 | 16.20 | 15.00 | Any Transfer of a Keg to a country with exceptional reverse logistics costs (e.g. Kazakhstan). |

A deposit on each Keg will also be assessed if appropriate, as per section 7 of Appendix 1.
**The costs above represent the total charges Brewer owes Global Keg for filling a rental keg.**

4.    A one-time **Implementation Deposit** of €4,000 will be charged per Brewer to provide a scanning solution to enable Brewer to Scan Kegs and must be paid before install begins and Kegs ship to Brewer. This Deposit will be refundable once all Global Keg assets have been returned in good working order to Global Keg and all outstanding invoices and fees paid. Any owed amounts by Brewer to Global Keg may be withheld from this deposit.

 **GLOBAL KEG ASSET RENTAL AGREEMENT**

5.  If the shipments of Kegs to Brewer are palletized loads, then a **Pallet Fee** of €8.00 will be charged for each pallet.

6.  A **Lost Keg Fee** will result when a keg is deemed by Brewer to be lost **while under their direct control** and a lost fee of €90 on a Half Barrel/50L, €80 on a Quarter Barrel/30L and €70 on a Sixth Barrel/20L for each Keg will be charged to Brewer. For the avoidance of doubt, a Keg is under the direct control of Brewer from the moment it is Scanned in on delivery to the brewery to the moment it is Scanned out to an authorized receiver. A Keg remains under the Brewer's direct control if a Keg is transferred to an authorized receiver and Global Keg is not electronically notified per the requirements of Section 3, "Brewer's Responsibilities". For any Keg that was previously charged to the Brewer as 'lost' and is subsequently located by Global Keg, the Lost Keg Fee will be credited to the Brewer. **Once the keg has been Scanned and Transferred to an authorized Global Keg receiver, Brewer will not be liable for any Lost Keg Fees.**

7.  Until such a time that a Brewer's Wholesaler/Distributor/Importer is Scanning Kegs through 100% of their supply chain (Scan in, Scan to Retail and Scan back from Retail which is defined as Gold or Platinum level), Global Keg will charge Brewer a **Keg Deposit** of €30 on all Kegs issued to Brewer once they have Scanned and shipped to that Wholesaler/Distributor/Importer or Retailer (Silver level). Brewer is responsible for recouping this deposit charge from its Wholesaler/Distributor/Importer or Retailer. Global Keg will return this deposit to the individual Wholesaler/Distributor/Importer or Retailer as soon as the empty Keg is returned to a Global Keg Reclamation Center undamaged and intact. In the event that Brewer ships Kegs to a Wholesaler/Distributor/Importer or Retailer who has been fully implemented on the Global Keg Scanning platform (Gold or Platinum level), Brewer will be refunded the deposit charge in its monthly invoice and advised to not charge that specific Wholesaler/Distributor/Importer or Retailer the deposit on any future keg shipments. Global Keg expects this deposit requirement to be only temporary and in a matter of time intends to remove deposits from the entire keg supply chain.

8.  In the case of a shipment to any receiver not pre-approved by Global Keg, Brewer will be charged a **Do Not Ship Fee** of €90. The Do-Not-Ship Fee will be credited back to Brewer if, at any time, the Keg for which Brewer has paid such charge is identified by Discrete Tracking Number and located anywhere at a Global Keg authorized location.

9.  A **Destroyed Keg Fee** of €90 will be charged to Brewer for abusing the Keg while in Brewer control such that it has sustained structural damage or such other heavy damage that it cannot be re-deployed.

10. If Brewer rents less than 200 kegs average in a calendar month, all kegs issued in that month will be invoiced at the highest Issue Fee available.

11. A keg requirement Annual Forecast must be provided to Global Keg both when initiating business (via the brewery profile) and by September 1st each year outlining the anticipated monthly keg rental requirements for the subsequent year. An updated 90-day Specific Forecast must be provided by Brewer outlining the weekly keg rental requirements at the start of each month, and precise orders must be made at least ten (10) business days prior to the requested delivery date. Orders must be materially similar to the forecasted volumes although Global Keg will always do its utmost to meet Brewer's needs. Orders of less than ten (10) business days prior to the requested delivery date are "Emergency Orders" and are and will include an additional expedite fee on a "pass through" basis subject to Global Keg approval and Brewer acceptance.

12. Orders for Kegs cancelled within five (5) business days where the Kegs have already been shipped will be assessed a €75 cancellation fee plus actual costs incurred by Global Keg for shipment of that order.

13. Brewer is responsible for any international brokerage fees, tariffs or taxes.

**GL BAL** KEG

GLOBAL KEG ASSET RENTAL AGREEMENT

## APPENDIX 2

### SOFTWARE LICENSE

Background.

Global Keg owns and/or has been granted licenses from third party software companies to use and to sublicense to Global Keg's customers and service providers certain software for use in connection with the rental and use of the Kegs. This Appendix to the Agreement sets forth the terms and conditions by which Global Keg grants to Brewer a license or sublicense to such software and other software that Global Keg may provide to Brewer in connection with use, storage and handling of any Kegs.

1. Global Keg grants to Brewer, during the term of the Agreement, a non-exclusive license or sublicense, as the case may be, to use the Software solely in connection with the use, storage and handling of the Kegs in accordance with the Agreement, and for no other purpose.

2. Global Keg will either:
    (i)   Provide software for installation on existing hardware (i.e. customer owned Scanning devices, computers, tablets or smart phones) at no additional cost to Brewer; and/or
    (ii)  Provide hardware and equipment, including RFID and/or barcode Scanners and associated equipment intended specifically for the Scanning of the Kegs' Discrete Tracking Numbers and the related data concerning the product within the Keg, its destination, expiry, etc. at no additional cost to Brewer.

    Global Keg will own, maintain and service said provided equipment and software for the life of this Agreement and subsequent future Agreements. Provision of said software or equipment is at Global Keg's complete discretion.

3. Brewer will follow recommended practices and guidelines and provide proper care for Global Keg provided equipment as specified in applicable user guides.

4. Where available and agreed by both parties, Global Keg will facilitate software integration and Brewer agrees to co-develop an approved software integration solution with existing Manufacturing/Shipping/Warehouse Management Systems (i.e. Route Accounting, Red Prairie, SAP, etc.). Brewer will make the necessary modifications to management systems to allow for integration of the Global Keg Discrete Tracking Numbers to be associated with their respective product or shipping identifiers at Global Keg's cost. These associated identifiers and the Global Keg Discrete Tracking Number record is then utilized to electronically inform Global Keg of the current whereabouts, transfer or movement of each discrete Keg to a downstream location (i.e. Wholesaler, Distributor, or Retailer).

## Appendix 3

### GLOBAL KEG QUALITY GUIDELINES

1. Kegs will ship to Brewer stripped of any obvious non-Global Keg external markings (stickers, tax discs etc.) and drained of more than 70 % of liquid.
2. Kegs will ship to Brewer unitized on a pallet.
3. Kegs will ship to Brewer with an intact valve that does not leak.
4. Kegs will ship to Brewer with no substantial structural damage to the chime or Keg body

If any Kegs are shipped that do not meet these criteria, Global Keg will credit Brewer €10 per keg and replace or repair damaged Kegs at Global Keg's own cost.

 **GLOBAL KEG ASSET RENTAL AGREEMENT**

### Appendix 4

**INTERNATIONAL SHIPMENT AUTHORIZATION BY COUNTRY AND
WHOLESALER/DISTRIBUTOR/IMPORTER**

| INTERNATIONAL SHIPMENT AUTHORIZATION BY COUNTRY AND DISTRIBUTOR/IMPORTER | | |
|---|---|---|
| **COUNTRY** | **NAME OF DISTRIBUTOR/IMPORTER** | **ISSUE FEE PRICING CATEGORY** |
| UK | | EUROPEAN |
| USA | | NORTH AMERICAN |
| CANADA | | NORTH AMERICAN |
| CHINA (HONG KONG) | | ASIAN |
| SINGAPORE | | ASIAN |
| AUSTRALIA | | AUSTRALASIAN |
| KAZAKHSTAN | | EXCEPTIONAL |

# EXHIBIT F



### GLOBAL KEG ASSET RENTAL AGREEMENT

**THIS ASSET RENTAL AGREEMENT** (the "**Agreement**") is made on the 1st day of November 2017 ("**Effective Date**") between Global Keg Rental LLC, **a Nevada limited liability company** ("**Global Keg**") located at **6675 Westwood Blvd, Orlando, Florida 32821** and Global Beer Network – Win-It-Too Inc. ("**Brewer**"), located at **30 Log Bridge Rd., Building 300, Unit 301, Middleton, MA 01949.**

1.   Purpose of Agreement

This Agreement defines the legal and commercial relationship between Global Keg and Brewer and specifies the parties' responsibilities in relation to the rental and use of Global Keg's kegs (the "**Kegs**"). Brewer agrees to use the Kegs in accordance with the terms of this Agreement and its appendices. Commencing on the Effective Date, Brewer may begin to use Kegs for product filling and subsequent shipment to customers (distributors, wholesalers and retailers).

2.   Global Keg's Responsibilities

Global Keg agrees that it will:

A.   Rent Kegs to Brewer at the pricing and other terms as set forth in Appendices hereto.

B.   Provide accurate and timely invoices.

C.   Inspect and clean the exterior of all Kegs and ensure all Kegs are serviceable and **"fit for use"** per the quality guidelines referenced in Appendix 3.

D.   Provide technical and information management services for all Kegs, as agreed with Brewer. Credit Brewer for fees charged for any Keg that is found to be not fit for use or contains defects in material and/or workmanship, except as caused by Brewer's or its agents' or employees' negligence or misuse.

E.   Furnish Brewer with Scan equipment or Scan software and maintain Scan equipment or software to facilitate Scanning.

F.   Furnish Brewer with a regular suite of reports with important data regarding the movement of the Kegs and the associated product data.

G.   Global Keg will manage the reverse logistics and collection of empty Kegs with Brewer's customers.

3.   Brewer's Responsibilities

Brewer agrees that it will:

A.   Use Kegs in accordance with established industry handling standards consistent with those standards currently in place at Brewer.

B.   Accept deliveries of Kegs from Global Keg, as well as from other Global Keg customers, Global Keg Reclamation Centers and Global Keg 3PL Warehouses, all of which will be subject to the terms of this Agreement.

C.   Not use any Kegs that it finds to be defective, damaged or unfit for use, and separate any keg it finds to be defective, damaged, or unfit for use for collection in a reasonable time frame by Global Keg who will be notified of said defect in order to promptly repair or replace.

D.   Acknowledge and agree that (i) Each Keg is of a size and capacity ordered by Brewer, (ii) Brewer is satisfied that each Keg rented pursuant to this Agreement is suitable for its purpose, and (iii) Global Keg rents out each Keg according to Global Keg quality guidelines, as set forth in Appendix attached hereto. Once the Kegs have been delivered and accepted by Brewer, Global Keg makes no warranty or representation, either express or implied, as to the fitness of the Kegs for any particular purpose while filled, under load or otherwise.

    GLOBAL KEG ASSET RENTAL AGREEMENT

E.  Promptly and accurately Scan and electronically report all Receipts, Fills and Transfers of Kegs to Global Keg.

F.  Clean and sanitize the Kegs in accordance with industry standards before filling with product.

G.  Upon filling a Keg, transmit Brewer supplied Keg content information to include "Sell-by-Date" and Brewer's "SKU" identifiers electronically using optical or RFID Scanning technology supplied by Global Keg or Brewer or combination thereof.

H.  Pay Global Keg invoices in accordance with the terms agreed between Global Keg and Brewer.

I.  From time to time and with proper notice allow Global Keg and its agents and employees access to Brewer's premises and vehicles (and premises and vehicles under Brewer's control) during business hours to conduct inventory of the Kegs and IT Property, inspect the condition and location of any Kegs and IT Property and verify Brewer's compliance with the terms of this Agreement, industry accepted keg handling standards and current Brewer handling, cleaning, and use practices.

J.  Transfer Kegs only to locations agreed to by Global Keg and Brewer that are permitted to possess Kegs. The list of locations authorized to receive Global Keg kegs will be updated on an as needed basis.

K.  As of the Effective Date, Brewer can Transfer Kegs only to countries listed in the Appendices. For Transfers to any other country, Brewer will notify and seek approval in advance, in writing, from Global Keg on a country by country basis.

L.  Brewer will provide electrical and network access as required to install and operate Global Keg data capture and transmission devices and computers.

M.  Brewer will provide ship to data and other reporting from time to time to facilitate Scan reconciliation of Keg movements.

4.  <u>Rental Charges and Payment</u>

A.  The parties agree to the rental and other terms, as set forth in Appendices concerning the rental of Kegs and Global Keg provided pallets.

B.  Invoices for the rental of Kegs may contain the following separate main charges: Issue Fee, Pallet Fee, Keg Deposit and any applicable taxes.

C.  If Brewer does not follow the Global Keg handling and Scanning procedures, then there are potential further charges which could be included in an invoice. Such as, the Do-Not-Ship Fee, Destroyed Keg Fee and Lost Keg Fee. Subsequent additional charges may be included and agreed to from time to time.

D.  All the relevant recurring charges are described as follows:

**Issue Fee** - One-time charge for each Keg charged upon receipt of Keg by Brewer set forth in Appendices.

**Pallet Fee** - A charge for the provision of each pallet in the shipment of Kegs to Brewer set forth in Appendices.

**Lost Keg Fee** - Specific charge for the loss of any Keg which is only assessed under certain circumstances set forth in Appendices.

**If the Brewer Scans and Transfers to an authorized Global Keg receiver, Brewer will not be liable for any Lost Keg Fees.**

**Keg Deposit** - One-time deposit charged for the Transfer of a Keg to an authorized location by Brewer, to be returned or refunded once the Keg is returned to a Global Keg Reclamation Center undamaged and intact set forth in Appendices.



### GLOBAL KEG ASSET RENTAL AGREEMENT

**Do Not Ship Fee** - One-time charge for the Transfer of a Keg to any location outside of approved locations or countries set forth in Appendices.

**Destroyed Keg Fee** – One-time charge to Brewer for abusing the Keg while under direct Brewer control such that it has sustained structural or other heavy damage so that it cannot be re-deployed set forth in Appendices.

**Fuel Surcharge** – A charge to Brewer per Keg if fuel prices of the average per gallon cost of diesel fuel, referenced in the U.S. Department of Energy website http://www.eia.gov/petroleum/gasdiesel/, increase beyond the baseline cost listed in Appendices.

E.  All charges, including all applicable taxes (sales, use, personal property, service or similar) and any other charges required by law, shall accrue daily and be payable within Thirty (30) days from the date of the invoice.

F.  A late fee of 1.5% per month will be assessed on all invoices not paid within Ten (10) days of the invoice due date.

5.  <u>Restrictions on Use of Global Keg Property</u>

The Kegs and IT Property shall at all times remain the exclusive property of Global Keg. Brewer has no right to sell or deal with the Kegs or IT Property in any way that is inconsistent with ownership of the Kegs and IT Property by Global Keg. Brewer hereby agrees not to purchase or rent Global Keg Kegs from any source other than Global Keg or an authorized Global Keg agent, provided, however that nothing herein shall prevent Brewer from purchasing or renting kegs from a third-party in the event Global Keg is unable to meet Brewer's order requirements, and expressly waives any and all liens (including, without limitation, warehousemen's liens), security interests or any other legal or equitable claims of title to the Kegs or IT Property and shall indemnify Global Keg from and against any such claims by third parties arising out of Brewer's possession or use of the Kegs or IT Property. Upon request, Brewer shall execute any documents necessary to acknowledge, publish, file and record this Agreement and the rights of Global Keg under this Agreement.

The Kegs shall always carry Global Keg identification marks such as the Global Keg logo, telephone number, bar code label and RFID tag (utilizing Discrete Tracking Number). Brewer agrees not to remove or deface the Global Keg logo or telephone number in any manner. Brewer also agrees not to disable, remove or otherwise render inoperable the bar code label or the RFID tag.

If Brewer defaces Kegs or damages Global Keg IT Property, Brewer shall reimburse Global Keg for the cost of returning the Keg to its original condition (up to and including replacing the Keg) and repairing or replacing damaged IT Property.

The terms of Brewer's use of any software included in the IT Property are governed by the Software License attached to this Agreement as Appendix 2.



GLOBAL KEG ASSET RENTAL AGREEMENT

6.    Term and Termination

This Agreement shall have a two (2) year term and will automatically renew on the first anniversary of the Agreement unless either of the Parties indicates in writing a desire to cancel or modify the Agreement giving a minimum of six (6) months' notice in advance of the expiry of the Agreement to the other Party.

   A.    Either Party may terminate this Agreement immediately by written notice if (i) bankruptcy or insolvency proceedings are brought by or against either Party, or either Party makes an arrangement with its creditors, or a receiver or administrator is appointed over any of its assets, or either Party goes into liquidation or is wound up, or either Party is subject to any other similar procedure.

   B.    In the unlikely event of a material breach of a provision of this Agreement by either Party, the other Party shall have the right to terminate the Agreement immediately (i) if the material breach cannot be cured, or (ii) if the material breach remains uncured forty-five (45) days subsequent to the receipt of written notice of the material breach.

   C.    Brewer must return all Kegs and IT property to Global Keg on or before thirty (30) days following termination of this Agreement in accordance with this Agreement. Any Kegs not returned to Global Keg within that period shall be subject to a replacement fee of $100 per Keg.

7.    Limitation of Liability and Indemnity

   A.    Neither Party shall be liable to the other for lost revenues or profits, or indirect, special, incidental, punitive or consequential damages regardless of legal theory or foreseeability.

   B.    Subject to paragraph 7.A, Brewer will indemnify Global Keg, its agents and employees against all losses, costs and damages (including reasonable attorneys' fees and expenses) which they may incur as a result of (i) any claims or suits against Global Keg, its agents and employees arising from the use of the Kegs by Brewer or any third party acting on behalf, or at the direction, of Brewer when such use is in breach of the terms of this Agreement (including, but not limited to, use that is not in accordance with the handling guidelines of Global Keg or is due to or arising out of any defect, failure, or misuse of any racking or handling equipment), and (ii) any material breach of this Agreement by Brewer. The provisions of this paragraph 7.B will survive the termination or expiration of this Agreement.

   C.    Subject to paragraph 7.A, Global Keg will indemnify Brewer, its agents and employees from and against all losses, costs and damages (including reasonable attorneys' fees and expenses) arising from or related to any negligence, willful misconduct or material breach of this Agreement by Global Keg. The provisions of this paragraph 7.C will survive the termination or expiration of this Agreement.

8.    Confidentiality

Confidential Information means (a) any business or technical information of Global Keg or Brewer, including but not limited to any information relating to either Party's products, services, prices, marketing plans, business opportunities, customers, or personnel, and (b) any other information of Global Keg or Brewer that is specifically designated by the disclosing Party as confidential or proprietary. Confidential Information shall not include information that (i) is in or enters the public domain without breach of this Agreement by the receiving Party, (ii) was demonstrably in the possession of the receiving Party prior to first receiving it from the disclosing Party without restriction on disclosure, (iii) the receiving Party can demonstrate was developed by the receiving Party independently and without use of or reference to the disclosing Party's Confidential Information, or (iv) the receiving Party receives from a third party without restriction on disclosure and without breach of a nondisclosure obligation. Each Party shall maintain the Confidential Information of the other Party in strict confidence until such time as the Confidential Information falls under one of the exceptions listed in items (i) through (iv) above. Each Party shall exercise no less than reasonable care with respect to the handling and protection of such Confidential Information. Each Party shall use the Confidential Information of the other Party only to perform its obligations under this Agreement, and shall disclose such Confidential Information only to its employees and independent contractors who are subject to binding use and disclosure restrictions at

 **GLOBAL KEG ASSET RENTAL AGREEMENT**

least as protective as those set forth herein and only as is reasonably required in connection with the exercise of its rights and obligations under this Agreement. Notwithstanding the above, the receiving Party may disclose Confidential Information of the disclosing Party pursuant to a valid order or requirement of a court or government agency, provided that the receiving Party gives prompt notice to the disclosing Party upon receiving the order or learning of the requirement. Any such disclosure by the receiving Party of the Confidential Information of the disclosing Party, shall, in no way, be deemed to change, affect or diminish the confidential status of such Confidential Information.

9. <u>Designated Representative</u>

Brewer's Designated Representative and the address, phone number, facsimile number and email address for notice to the Designated Representative as well as the email address to which electronic invoices should be directed are:

| | |
|---|---|
| Designated Representative: | Cliff Lusso |
| Address: | 30 Log Bridge Rd, Building 300, Unit 301, Middleton, MA 01949 |
| Phone No: | 978-767-4177 |
| Facsimile No: | 805-683-1470 |
| Contact Email Address: | cliff@globalbeer.com |
| Email Address for Delivery of Electronic Invoices: | account@globalbeer.com |

10. <u>Headings</u> The headings in this Agreement are inserted for convenience only and shall not affect the construction or interpretation of this Agreement.

11. <u>Applicable Law, Arbitration</u> This Agreement shall be deemed to be made under, and to be governed by, the laws of the State of Florida.

12. <u>Waiver</u> A waiver by either Party of any term or condition of this agreement in any instance shall not be deemed or construed to be a waiver of such term or condition for the future, or any subsequent breach thereof.

13. <u>Severability</u> If any provision of this Agreement is determined to be invalid, illegal, or unenforceable to any extent by an arbitrator or court of competent jurisdiction, that provision shall be construed as though more narrowly drawn if a narrower construction would avoid invalidity, illegality, or unenforceability, or if that is not possible, such provision shall be severed and the remaining provisions of this Agreement shall remain in effect.

14. <u>Assignment</u> Neither Party shall have the right to assign, transfer and/or sublicense its rights and/or duties and obligations arising under this Agreement, either in whole or in part, without the prior written consent of the other Party, such consent not to be unreasonably withheld, conditioned and/or delayed.

15. <u>Exclusivity of Arrangements</u> During the term of the Agreement, Brewer shall not conclude or enter into any agreement or understanding with any third-party regarding the lease, rental or licensing of any kegs for use in Brewer's business without prior written consent from Global Keg.

16. <u>Entire Understanding</u> This Agreement constitutes the whole and entire agreement of the Parties with respect to the subject matter of this Agreement, and it shall not be modified or amended in any respect except by a written

 **GLOBAL KEG ASSET RENTAL AGREEMENT**

instrument executed by both Parties. This Agreement replaces and supersedes all prior agreement whether written or oral between the parties with respect to the subject matter herein.

17.   <u>Counterparts</u> This Agreement may be executed in counterparts, each of which will be deemed an original Agreement for all purposes and which collectively will constitute one and the same Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

By:   **Global Beer Network – Win-It-Too Inc.**

Steve Villani, President

By: **GLOBAL KEG RENTAL, LLC**

Bobby L. Moore, Chief Executive

 GLOBAL KEG ASSET RENTAL AGREEMENT

## APPENDIX 1

### CHARGES FOR USE OF GLOBAL KEG KEGS

1. All pricing in Appendix 1 is denominated in U.S. Dollars and is contingent upon annual rental of 20,000 Kegs of any size.

2. Issue Fees are based on **minimum orders of at least 4 unit loads per order in any combination of the following configurations: 24 (1/2 bbl) per unit load, 48 (1/4 bbl) per unit load or 60 (1/6 bbl) per unit load (a unit load is 3 pallets high).**

3. Issue Fees will be assessed at the Local Issue Fee price upon shipment of Kegs to Brewer. The remaining Issue Fee balance owed, if shipped to Regional, Extended Regional or National Wholesalers, will be invoiced at the time of Transfer unless Brewer is exclusively Transferring internationally or receiving Issues internationally, then Issue Fees will be assessed immediately at the International Issue Fee level.

4. A **Local Issue Fee** of $8.00 per Keg on Half Barrels/50L, $7.50 per Keg on Quarter Barrels/30L and $7.00 per Keg on Sixth Barrels/20L will be charged on the receipt of each Keg by Brewer. A Local Issue is defined as shipments that are returned to and Scanned into a Global Keg Reclamation Center within 30 days from date of Issue. If a keg returns in over 30 days, it will be invoiced at the Regional, Extended Regional, National Issue Fee or International Issue Fee (depending on distance or country noted on those fees below). The exception to this will be if a Brewer is exclusively renting kegs for international shipments then the International Issue Fee will be billed immediately.

5. A **Regional Issue Fee** of $12.00 per Keg on Half Barrels/50L, $10.50 per Keg on Quarter Barrels/30L and $9.00 per Keg on Sixth Barrels/20L will be charged on the receipt of each Keg by Brewer. A Regional Issue Fee is defined for Wholesalers located at a distance not greater than 500 miles from Brewer's production location.

6. An **Extended Regional Issue Fee** of $16.00 per Keg on Half Barrels/50L, $14.00 per Keg on Quarter Barrels/30L and $12.00 per Keg on Sixth Barrels/20L will be charged on the receipt of each Keg by Brewer. Extended Regional Issue Fee is defined for Wholesalers located at a distance greater than 500 miles but less than 1,000 miles from Brewer's production location.

7. A **National Issue Fee** of $17.50 per Keg on Half Barrels/50L, $15.00 per Keg on Quarter Barrels/30L and $14.00 per Keg on Sixth Barrels/20L will be charged on the receipt of each Keg by Brewer. A National Issue Fee is defined for Wholesalers located at a distance over 1,000 miles from Brewer's production location.

8. An **International Issue Fee** of $18.00 per Keg on Half Barrels/50L, $15.00 per Keg on Quarter Barrels/30L and $14.00 per Keg on Sixth Barrels/20L will be charged on the receipt of each Keg by Brewer. An International Issue Fee is defined for any location outside of the United States or Canada. Unless the country is noted in the Appendices, Brewer must have written permission to ship to the customer outside of the United States or Canada in writing from Global Keg before initiating shipments or Brewer agrees to pay a Do Not Ship Fee.

 **GLOBAL KEG ASSET RENTAL AGREEMENT**

| SUMMARY OF ISSUE FEES IN U.S. DOLLARS | | | |
|---|---|---|---|
| **Fee Type** | **Half Barrels/ 58.6L or 50L** | **Quarter Barrels/ 30L** | **Sixth Barrels/ 20L** |
| Local Issue Fee (<30 Days) | $8.00 | $7.50 | $7.00 |
| Regional Issue Fee (<500 miles) | $12.00 | $10.50 | $9.00 |
| Extended Regional Issue Fee (>500 but <1,000 Miles) | $16.00 | $14.00 | $12.00 |
| National Issue Fee (>1,000 Miles) | $17.50 | $15.00 | $14.00 |
| International Issue Fee (any location outside the US or Canada) *Must have Global Keg authorization in writing before shipping or Do Not Ship Fee is payable | $18.00 | $15.00 | $14.00 |

**The costs above represent the total charges Brewer owes Global Keg for filling a rental keg.**

9. A one-time **Implementation Fee** of $5,000 will be charged per Brewer and provide a scanning solution to enable Brewer to Scan Kegs and must be paid before install begins and Kegs ship to Brewer.

10. If the shipments of Kegs to Brewer are palletized loads, then a **Pallet Fee** of $7.00 will be charged for each Global Keg owned pallet.

11. A **Lost Keg Fee** will result when a keg is deemed by Brewer to be lost <u>while under their direct control</u> and a lost fee of $100 on a Half Barrel/50L, $85 on a Quarter Barrel/30L and $70 on a Sixth Barrel/20L for each Keg will be charged to Brewer. For the avoidance of doubt, a Keg is under the direct control of Brewer from the moment it is Scanned in on delivery to the brewery to the moment it is Scanned out to an authorized receiver. A Keg remains under the Brewer's direct control if a Keg is transferred to an authorized receiver and Global Keg is not electronically notified per the requirements of Section 3, "Brewer's Responsibilities". For any Keg that was previously charged to the Brewer as 'lost' and is subsequently located by Global Keg, the Lost Keg Fee will be credited to the Brewer. **Once the keg has been Scanned and Transferred to an authorized Global Keg receiver, Brewer will not be liable for any Lost Keg Fees.**

12. Until such a time that a Brewer's Wholesaler/Distributor/Importer is Scanning Kegs through 100% of their supply chain (Scan in, Scan to Retail and Scan back from Retail which is defined as Gold or Platinum level), Global Keg will charge Brewer a **Keg Deposit** of $30 on all Kegs issued to Brewer once they have Scanned and shipped to that Wholesaler/Distributor/Importer or Retailer (Silver level). Brewer is responsible for recouping this deposit charge from its Wholesaler/Distributor/Importer or Retailer. Global Keg will return this deposit to the individual Wholesaler/Distributor/Importer or Retailer as soon as the empty Keg is returned to a Global Keg Reclamation Center undamaged and intact. In the event that Brewer ships Kegs to a Wholesaler/Distributor/Importer or Retailer who has been fully implemented on the Global Keg Scanning platform (Gold or Platinum level), Brewer will be refunded the deposit charge in its monthly invoice and advised to not charge that specific Wholesaler/Distributor/Importer or Retailer the deposit on any future keg shipments. Global Keg expects this deposit requirement to be only temporary and in a matter of time intends to remove deposits from the entire keg supply chain.

13. In the case of a shipment to any receiver not pre-approved by Global Keg, Brewer will be charged a **Do Not Ship Fee** of $100. The Do-Not-Ship Fee will be credited back to Brewer if, at any time, the Keg for which

  **GLOBAL KEG ASSET RENTAL AGREEMENT**

Brewer has paid such charge is identified by Discrete Tracking Number and located anywhere at a Global Keg authorized location.

14.  A **Destroyed Keg Fee** of $100 will be charged to Brewer for abusing the Keg while in Brewer control such that it has sustained structural damage or such other heavy damage that it cannot be re-deployed.

15.  Global Keg reserves the right to charge a **Fuel Surcharge** per Keg to Brewer if the average per gallon cost of diesel fuel, referenced in the U.S. Department of Energy website http://www.eia.gov/petroleum/gasdiesel/, goes above $2.75 per gallon.

16.  A rebate of $1.00 per Keg will be applied to each Issue Fee for up to 50% of the total cost of Brewer's Keg manufacturing line conversion costs directly related to filling Global Kegs. This must be agreed to in writing and accepted by Global Keg in advance of said Brewer conversion.  As an example and for clarity, if there are certain line modifications required, costing a total of $18,000, Global Keg will rebate $1.00 per Keg for the first 9,000 Global Kegs Issued until $9,000 (50% of $18,000) had been rebated.

17.  If Brewer rents less than 200 kegs in a calendar month, all kegs issued in that month will be invoiced at the National Issue Fee level.

18.  After a minimum of 6 months into the term of this Agreement, if Global Keg's scan data shows a Brewer's issued kegs are returning empty to Global Keg more than 120 days on average from the time of Issue (Minimum of 3 Turns Per Year), all subsequent kegs issued to Brewer will be invoiced at the Extended Regional Issue Fee level, excluding those kegs that are shipped nationally which will incur the National Issue Fee.

19.  A keg requirement Annual Forecast must be provided to Global Keg by September 1st each year outlining the anticipated monthly keg rental requirements for the subsequent year.  An updated 90-day Specific Forecast must be provided by Brewer outlining the weekly keg rental requirements at the start of each month, and precise orders must be made at least ten (10) business days prior to the requested delivery date. Orders must be materially similar to the forecasted volumes although Global Keg will always do its utmost to meet Brewer's needs.  Orders of less than ten (10) business days prior to the requested delivery date are "Emergency Orders" and are subject to acceptance by Global Keg and an additional expedite fee of $2.00 per Keg.

20.  Orders for Kegs cancelled within five (5) business days where the Kegs have already been shipped will be assessed a $75 cancellation fee plus actual costs incurred by Global Keg for shipment of that order.

21.  Brewer is responsible for any international brokerage fees, tariffs or taxes.


## APPENDIX 2

### SOFTWARE LICENSE

Background.
Global Keg owns and/or has been granted licenses from third party software companies to use and to sublicense to Global Keg's customers and service providers certain software for use in connection with the rental and use of the Kegs. This Appendix to the Agreement sets forth the terms and conditions by which Global Keg grants to Brewer a license or sublicense to such software and other software that Global Keg may provide to Brewer in connection with use, storage and handling of any Kegs.

1.  Global Keg grants to Brewer, during the term of the Agreement, a non-exclusive license or sublicense, as the case may be, to use the Software solely in connection with the use, storage and handling of the Kegs in accordance with the Agreement, and for no other purpose.



# GLOBAL KEG ASSET RENTAL AGREEMENT

2. Global Keg will either:
   (i) Provide software for installation on existing hardware (i.e. customer owned Scanning devices, computers, tablets or smart phones) at no additional cost to Brewer; and/or
   (ii) Provide hardware and equipment, including RFID and/or barcode Scanners and associated equipment intended specifically for the Scanning of the Kegs' Discrete Tracking Numbers and the related data concerning the product within the Keg, its destination, expiry, etc. at no additional cost to Brewer.

   Global Keg will own, maintain and service said provided equipment and software for the life of this Agreement and subsequent future Agreements. Provision of said software or equipment is at Global Keg's complete discretion.

3. Brewer will follow recommended practices and guidelines and provide proper care for Global Keg provided equipment as specified in applicable user guides.

4. Where available and agreed by both parties, Global Keg will facilitate software integration and Brewer agrees to co-develop an approved software integration solution with existing Manufacturing/Shipping/Warehouse Management Systems (i.e. Route Accounting, Red Prairie, SAP, etc.). Brewer will make the necessary modifications to management systems to allow for integration of the Global Keg Discrete Tracking Numbers to be associated with their respective product or shipping identifiers at Global Keg's cost. These associated identifiers and the Global Keg Discrete Tracking Number record is then utilized to electronically inform Global Keg of the current whereabouts, transfer or movement of each discrete Keg to a downstream location (i.e. Wholesaler, Distributor, or Retailer).

## Appendix 3

### GLOBAL KEG QUALITY GUIDELINES

1. Kegs will ship to Brewer stripped of any obvious non-Global Keg external markings (stickers, tax discs etc.) and drained of more than 70 % of liquid.
2. Kegs will ship to Brewer unitized on a pallet.
3. Kegs will ship to Brewer with an intact Sankey 'D' type sphere that does not leak.
4. Kegs will ship to Brewer with no substantial structural damage to the chime or Keg body

If any Kegs are shipped that do not meet these criteria, Global Keg will credit Brewer $10 per keg and replace or repair damaged Kegs at Global Keg's own cost.

## Appendix 4

### BREWER BRAND/BREW AND PRODUCT EXPIRATION DATE

| SKU / Brew | Expiration in Days |
|---|---|
| See Brewery Profile | |
| | |
| | |
| | |



GLOBAL KEG ASSET RENTAL AGREEMENT

## Appendix 5

### 90-DAY INITIAL ORDER FORECAST

| LOCATION: | ORDER QUANTITY | | |
|---|---|---|---|
| **Month**<br>See brewery profile | **Half Barrels** | **Quarter Barrels** | **Sixth Barrels** |
| | | | |
| | | | |

## Appendix 6

### INTERNATIONAL SHIPMENT AUTHORIZATION BY COUNTRY AND DISTRIBUTOR/IMPORTER

| COUNTRY | IMPORTER |
|---|---|
| Belgium | Global Beer Network - Win-It-Too Inc. |
| Czech Republic | Global Beer Network - Win-It-Too Inc. |

# EXHIBIT G

Global Asset/Global Kegs as of 9/11/20

| | Ace Bev-PA | Advintage-SC | Aleph-SC | Atomic-WVA | Backup Bev-MD | Bond-MD | Brewer-WA | Brown Dist-VA | Bock Dist-MD | C & C-RI | Cavalier-IN | Cavalier-FL | Cavalier-OH | Central-ME | Crescent Crown-AZ | Crescent Crown-LA | DOPS-MD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Number of empty Global Kegs from the 5 GBN Brewers ready for pick up: | | | | | | | | | | | | | | | | | |
| Br DeBrabandere kegs | 0 | 0 | 7 | 4 | 64 | 0 | 24 | 0 | 0 | 0 | 0 | 248 | 0 | 21 | 134 | 0 | 22 |
| Br Schneider Weisse kegs | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Br Sily kegs | 0 | 0 | 4 | 0 | 8 | 0 | 9 | 0 | 0 | 0 | 0 | 128 | 0 | 1 | 24 | 0 | 0 |
| Br Steigl kegs | 0 | 29 | 0 | 0 | 0 | 46 | 8 | 0 | 2 | 0 | 8 | 6 | 66 | 0 | 23 | 0 | 7 |
| Br Van Steenberge keg | 1 | 0 | 7 | 52 | 69 | 0 | 10 | 0 | 0 | 2 | 0 | 246 | 0 | 6 | 25 | 0 | 19 |
| Totals | 1 | 29 | 18 | 56 | 141 | 46 | 51 | 0 | 2 | 2 | 8 | 665 | 66 | 28 | 206 | 0 | 48 |
| Total $ s | $30.00 | $870.00 | $540.00 | $1,680.00 | $4,230.00 | $1,380.00 | $1,530.00 | $0.00 | $60.00 | $60.00 | $240.00 | $19,950.00 | $1,980.00 | $840.00 | $6,180.00 | $0.00 | $1,440.00 |

| Global Asset/Global Keg as of 9/11/20 | Ellis-CO | Favorite Brands-NM | Favorite Brands-TX | Ferment - DC | Freedom - NC | Georges - MT | Golden Beverage-UT | Heidelberg - KY | High Country-CO | Hoffman - VA | Idaho Wine - ID | JJ Taylor- MN | Kendall's- WA | Kohler-NJ | Lipman - TN | Louis Glunz IL | Major Brands-MO |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Number of empty Global Kegs from the 5 GBN Brewers ready for pick up:** | | | | | | | | | | | | | | | | | |
| Br Dollar/numero kegs | 122 | 12 | 360 | 1 | 0 | 174 | 0 | 6 | 0 | 15 | 0 | 6 | 1 | 27 | 16 | 0 | 0 |
| Br Schooner/Weisse kegs | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Br Sixly kegs | 28 | 0 | 55 | 2 | 0 | 0 | 0 | 0 | 0 | 19 | 0 | 9 | 0 | 0 | 0 | 61 | 0 |
| Br Stingz kegs | 351 | 0 | 0 | 0 | 135 | 82 | 0 | 6 | 4 | 0 | 152 | 0 | 17 | 9 | 57 | 576 | 0 |
| Br Von Steuben/ge keg | 51 | 2 | 230 | 3 | 0 | 1 | 0 | 9 | 2 | 15 | 0 | 9 | 3 | 2 | 5 | 6 | 249 |
| Totals | 552 | 14 | 644 | 6 | 135 | 257 | 0 | 23 | 6 | 49 | 152 | 23 | 21 | 38 | 78 | 643 | 249 |
| Total $'s | $17,760.00 | $420.00 | $19,320.00 | $180.00 | $4,050.00 | $7,710.00 | $0.00 | $690.00 | $180.00 | $1,470.00 | $4,560.00 | $690.00 | $630.00 | $1,140.00 | $2,340.00 | $19,290.00 | $7,470.00 |

84/88 M.2

Global Assets/Global Kegs as of 8/11/20

Number of empty Global Kegs from the 5 GBM Brewers ready for pick up

| | Mass Bev. Alliance MA | Millennium- NC | Muenster- CA | North Florida-FL | Northeast Bev.-CT | Origilio-PA | Pepin-FL | Point Blank-OH | Premium- OH | Revs MI | Remarkable- NY | Republic National-OK | Ritchie Page- NJ | Savannah- GA | Select Wines-VA | Specialty Imports-AK | Spriggs- WV |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Br Debretons/Irish kegs | 0 | 25 | 0 | 0 | 24 | 4 | 0 | 266 | 459 | 582 | 0 | 0 | 6 | 61 | 0 | 0 | 0 |
| Br Schnieder Weisse kegs | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Br Sly kegs | 0 | 9 | 0 | 0 | 0 | 16 | 0 | 2 | 23 | 47 | 0 | 0 | 17 | 17 | 0 | 0 | 0 |
| Br Stiegl kegs | 12 | 0 | 8 | 10 | 0 | 0 | 25 | 79 | 0 | 0 | 0 | 66 | 0 | 0 | 0 | 27 | 2 |
| Br Van Steenbergs keg | 0 | 14 | 0 | 0 | 0 | 224 | 0 | 2 | 155 | 224 | 0 | 0 | 23 | 73 | 8 | 4 | 0 |
| Total | 12 | 48 | 8 | 10 | 24 | 244 | 25 | 349 | 637 | 853 | 0 | 66 | 46 | 171 | 8 | 31 | 2 |
| Total $$ | $360.00 | $1,440.00 | $240.00 | $300.00 | $720.00 | $7,320.00 | $760.00 | $10,470.00 | $19,110.00 | $25,590.00 | $0.00 | $2,550.00 | $1,380.00 | $5,130.00 | $240.00 | $930.00 | $60.00 |

5 of 2

| Global Asset/Global Keg as of 9/11/20 | Tony Hewall PA | Underground Wine-HI | Western Daps WY | Westy's PA | Wine Best Imports OH | Wine Warehouse CA | Totals | Total $'s |
|---|---|---|---|---|---|---|---|---|
| Number of empty Global Kegs from the 5 GBN Brewers ready for pick up | | | | | | | | |
| Br Budweiser/Bira kegs | 50 | 0 | 5 | 28 | 0 | 1686 | 3919 | $117,330.00 |
| Br Schneider Weisse kegs | 0 | 0 | 0 | 0 | 0 | 0 | 0 | $0.00 |
| Br Biru kegs | 0 | 0 | 0 | 0 | 0 | 258 | 734 | $22,020.00 |
| Br Imag kegs | 0 | 0 | 0 | 0 | 128 | 442 | 2449 | $73,250.00 |
| Br Van Steenberge kegs | 272 | 0 | 0 | 28 | 0 | 452 | 2632 | $80,140.00 |
| Totals | 322 | 0 | 5 | 56 | 128 | 2366 | 9750 | |
| Total $'s | $9,660.00 | $0.00 | $150.00 | $1,500.00 | $3,840.00 | $71,940.00 | | $292,800.00 |

Global Asset/Global Kegs as of 9/11/20

| | Ace Brev.-PA | Admkings-SC | Aleph-SC | Alcnzc-WVA | Backup Bev.-MD | Good-MD | Brewer-WA | Brows Dist.-VA | Buck Dist.-MD | C & C-HI | Cavalier-HI | Cavalier-FL | Cavalier-OH | Central-ME | Crescent Crown-AZ | Crescent Crown-LA | DOPS-MD | Elite-CO | Feverte Brands-NM |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Number of empty Global Kegs from the 5 G&N Brewers ready for pick up:** | | | | | | | | | | | | | | | | | | | |
| Br. Ostfratsndwle kegs | 0 | 0 | 7 | 4 | 64 | 0 | 24 | 0 | 0 | 0 | 0 | 398 | 0 | 21 | 134 | 0 | 22 | 102 | 12 |
| Br. Schnelder Walssle kegs | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Br. Srly kegs | 0 | 0 | 4 | 0 | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 129 | 0 | 1 | 24 | 0 | 0 | 28 | 0 |
| Br. Stlegl kegs | 0 | 29 | 0 | 0 | 0 | 48 | 8 | 0 | 2 | 0 | 8 | 8 | 66 | 0 | 33 | 0 | 7 | 201 | 0 |
| Br. Von Steenberge keg | 1 | 0 | 7 | 62 | 40 | 0 | 18 | 0 | 0 | 2 | 0 | 246 | 0 | 0 | 26 | 0 | 18 | 61 | 2 |
| Totals | 1 | 29 | 18 | 58 | 141 | 48 | 81 | 0 | 2 | 2 | 8 | 696 | 66 | 20 | 206 | 0 | 48 | 692 | 14 |
| Total $'s | $30.00 | $870.00 | $540.00 | $1,680.00 | $4,230.00 | $1,380.00 | $1,830.00 | $0.00 | $60.00 | $60.00 | $240.00 | $19,960.00 | $1,980.00 | $840.00 | $6,180.00 | $0.00 | $1,440.00 | $17,760.00 | $420.00 |
| **Number of Global Kegs from the 5 G&N Brewers that will need to be picked up in the future:** | | | | | | | | | | | | | | | | | | | |
| Br. Ostfratsndwle kegs | 0 | 0 | 18 | 0 | 38 | 0 | 57 | 0 | 0 | 0 | 0 | 136 | 0 | 6 | 66 | 0 | 18 | 18 | 22 |
| Br. Schnelder Walssle kegs | 0 | 0 | 0 | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Br. Srly kegs | 1 | 0 | 4 | 0 | 8 | 0 | 24 | 0 | 0 | 0 | 0 | 8 | 0 | 0 | 34 | 0 | 0 | 4 | 0 |
| Br. Stlegl kegs | 0 | 6 | 0 | 0 | 0 | 19 | 118 | 0 | 20 | 0 | 0 | 0 | 0 | 0 | 32 | 53 | 1 | 62 | 18 |
| Br. Von Steenberge keg | 0 | 0 | 18 | 0 | 20 | 0 | 48 | 0 | 0 | 0 | 0 | 73 | 0 | 4 | 61 | 0 | 18 | 7 | 11 |
| Totals | 0 | 6 | 40 | 13 | 80 | 19 | 280 | 0 | 20 | 0 | 0 | 217 | 0 | 10 | 194 | 53 | 21 | 79 | 43 |
| Total $'s | $270.00 | $180.00 | $1,200.00 | $390.00 | $2,400.00 | $570.00 | $7,900.00 | $0.00 | $600.00 | $0.00 | $0.00 | $6,510.00 | $0.00 | $300.00 | $6,820.00 | $1,590.00 | $600.00 | $2,370.00 | $1,290.00 |

Booble F

| Global Asset/Global Keg as of 6/11/20 | Fybrate Brands-TX | Forrest-GC | Freedom-NC | Georges-MT | Golden Beverage-UT | Heidelberg-KY | Higa County-CO | Keftrue-VA | Idaho Wine-ID | JJ Taylor-MN | Kendall's-WA | Kohler-NJ | Lipman-TN | Louis Glunz-IL | Major Brands-MO | Mom. Bev. Alliance-MA | Millenium-NC | Mussellman-CA |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Number of empty Global Kegs from the 5 GBM Brewers ready for pick up: | | | | | | | | | | | | | | | | | | |
| Br. Oschlebandon kegs | 360 | 1 | 0 | 174 | 0 | 8 | 9 | 15 | 8 | 5 | 1 | 27 | 14 | 0 | 0 | 0 | 35 | 0 |
| br. Schneider Weisse kegs | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Br. Sily kegs | 86 | 2 | 0 | 8 | 0 | 0 | 0 | 10 | 0 | 9 | 0 | 0 | 0 | 61 | 0 | 0 | 9 | 0 |
| Br. Steig kegs | 0 | 0 | 136 | 82 | 0 | 8 | 4 | 0 | 162 | 0 | 17 | 9 | 67 | 678 | 6 | 12 | 0 | 8 |
| Br. Van Steenberge keg | 238 | 3 | 0 | 1 | 0 | 9 | 2 | 16 | 0 | 9 | 3 | 2 | 8 | 8 | 249 | 0 | 14 | 0 |
| Totals | 644 | 6 | 136 | 267 | 0 | 23 | 6 | 49 | 162 | 23 | 21 | 38 | 79 | 843 | 249 | 12 | 49 | 8 |
| Total $'s | $19,320.00 | $180.00 | $4,080.00 | $7,710.00 | $2.00 | $690.00 | $180.00 | $1,470.00 | $4,860.00 | $690.00 | $630.00 | $1,140.00 | $2,340.00 | $16,290.00 | $7,470.00 | $360.00 | $1,440.00 | $240.00 |
| Number of Global Kegs from the 5 GBM Brewers that will need to be picked up in the future: | | | | | | | | | | | | | | | | | | |
| Br. Oschlebandon kegs | 200 | 17 | 0 | 163 | 0 | 3 | 0 | 20 | 0 | 8 | 14 | 25 | 46 | 23 | 0 | 0 | 4 | 0 |
| br. Schneider Weisse kegs | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Br. Sily kegs | 57 | 3 | 0 | 0 | 0 | 0 | 0 | 5 | 5 | 1 | 0 | 0 | 66 | 0 | 0 | 6 | 0 | |
| Br. Steig kegs | 0 | 0 | 41 | 5 | 0 | 145 | 0 | 0 | 94 | 0 | 32 | 0 | 390 | 137 | 0 | 38 | 0 | 52 |
| Br. Van Steenberge keg | 163 | 9 | 0 | 2 | 0 | 6 | 0 | 0 | 0 | 12 | 44 | 27 | 10 | 49 | 80 | 0 | 0 | 0 |
| Totals | 430 | 29 | 41 | 170 | 139 | 154 | 0 | 20 | 94 | 23 | 90 | 52 | 446 | 283 | 80 | 38 | 15 | 52 |
| Total $'s | $13,600.00 | $870.00 | $1,230.00 | $5,100.00 | $4,170.00 | $4,650.00 | $270.00 | $600.00 | $2,820.00 | $690.00 | $2,640.00 | $1,680.00 | $13,380.00 | $8,790.00 | $1,530.00 | $1,140.00 | $450.00 | $1,560.00 |

**Global Asset #Global Kegs as of 9/11/20**

| | North Florida-FL | Northeast Bev.-CT | Origlio-PA | Pepin-FL | Point Blank-OR | Premium-OR | Reve-MI | Remarkable-NY | Republic National-OK | Ritchie Page-NJ | Savannah-GA | Select Wines-VA | Specialty Imports-AK | Sprague-WV | Tony Revell-FL | Underground Wine-IL | Western Glab-WV | Westly's-PA | Wine Beer Imports-OH |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Number of empty Global Kegs from the 5 GBM Brewers ready for pick up:** | | | | | | | | | | | | | | | | | | | |
| Br. Oelilrebrandere kegs | 0 | 24 | 4 | 0 | 256 | 459 | 882 | 0 | 0 | 8 | 81 | 0 | 0 | 0 | 50 | 0 | 0 | 28 | 0 |
| Br. Schneider Weisse kegs | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Br. Erly kegs | 0 | 0 | 18 | 0 | 2 | 23 | 47 | 0 | 0 | 17 | 17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Br. Hoegi kegs | 10 | 0 | 0 | 28 | 79 | 0 | 0 | 0 | 66 | 0 | 0 | 0 | 27 | 2 | 0 | 0 | 0 | 0 | 108 |
| Br. Van Steenberge keg | 0 | 0 | 722 | 0 | 2 | 166 | 234 | 0 | 0 | 23 | 73 | 8 | 4 | 0 | 272 | 0 | 0 | 28 | 0 |
| Totals | 10 | 24 | 744 | 28 | 349 | 637 | 963 | 0 | 66 | 48 | 171 | 8 | 31 | 2 | 322 | 0 | 0 | 84 | 108 |
| Total $'s | $300.00 | $720.00 | $7,320.00 | $780.00 | $10,470.00 | $19,110.00 | $28,560.00 | $0.00 | $2,650.00 | $1,380.00 | $5,130.00 | $240.00 | $820.00 | $60.00 | $9,660.00 | $0.00 | $150.00 | $1,680.00 | $3,840.00 |
| **Number of Global Kegs from the 5 GBM Brewers that will need to be picked up in the future:** | | | | | | | | | | | | | | | | | | | |
| Br. Oelilrebrandere kegs | 0 | 3 | 11 | 0 | 84 | 79 | 140 | 0 | 0 | 8 | 10 | 0 | 0 | 0 | 48 | 0 | 3 | 13 | 0 |
| Br. Schneider Weisse kegs | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Br. Erly kegs | 0 | 1 | 23 | 0 | 13 | 8 | 80 | 0 | 0 | 8 | 4 | 0 | 0 | 0 | 2 | 0 | 0 | 3 | 0 |
| Br. Hoegi kegs | 9 | 11 | 0 | 32 | 217 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 16 | 76 | 0 | 0 | 0 | 0 | 43 |
| Br. Van Steenberge kegs | 0 | 0 | 64 | 0 | 12 | 27 | 108 | 0 | 39 | 58 | 46 | 62 | 6 | 0 | 68 | 0 | 2 | 7 | 0 |
| Totals | 9 | 15 | 98 | 32 | 326 | 111 | 328 | 0 | 39 | 66 | 30 | 62 | 21 | 76 | 118 | 0 | 5 | 23 | 43 |
| Total $'s | $270.00 | $450.00 | $2,940.00 | $960.00 | $10,080.00 | $3,330.00 | $9,840.00 | $0.00 | $1,170.00 | $1,880.00 | $900.00 | $1,860.00 | $630.00 | $2,280.00 | $3,490.00 | $0.00 | $150.00 | $660.00 | $1,290.00 |

| Global Asset/Global Keg as of 9/11/20 | Wine Warehouse/CA | Totals | Total $'s | Global Beer Network | Total Global Kegs to U.S. | Global Kegs @ breweries | | Grand Totals |
|---|---|---|---|---|---|---|---|---|
| **Number of empty Global Kegs from the 5 GBN Brewers ready for pick up:** | | | | | | | | |
| Br Oakleslanders kegs | 1049 | 3911 | $117,330.00 | 474 | $14,240.00 | 4367 | | $131,610.00 |
| Br Schneider Weisse kegs | 0 | 0 | $0.00 | 0 | $0.00 | 0 | | $0.00 |
| Br Silly kegs | 756 | 734 | $22,020.00 | 90 | $2,700.00 | 824 | | $14,720.00 |
| Br Stiegl kegs | 440 | 2443 | $73,290.00 | 84 | $3,630.00 | 2527 | | $75,510.00 |
| Br Van Steenberge keg | 612 | 2672 | $80,160.00 | 1239 | $34,640.00 | 3900 | | $117,000.00 |
| Totals | 2346 | 9760 | | 1876 | $54,340.00 | 11636 | | $349,140.00 |
| Total $'s | $71,940.00 | $292,800.00 | | | | | | |
| | | | | | | | | |
| **Number of Global Kegs from the 5 GBN Brewers that will need to be picked up in the future:** | | | | | | | | |
| Br Oakleslanders kegs | 1336 | 2826 | $78,780.00 | 1809 | $46,270.00 | 4235 | $127,050.00 | 490 | $12,000.00 | 4636 | $139,060.00 |
| Br Schneider Weisse kegs | 0 | 6 | $160.00 | 231 | $6,900.00 | 235 | $7,080.00 | 220 | $6,600.00 | 455 | $13,680.00 |
| Br Silly kegs | 124 | 620 | $18,600.00 | 209 | $7,770.00 | 779 | $23,370.00 | 73 | $2,190.00 | 852 | $25,560.00 |
| Br Stiegl kegs | 576 | 2235 | $66,760.00 | 1409 | $42,270.00 | 3434 | $106,020.00 | | $0.00 | 3434 | $105,000.00 |
| Br Van Steenberge keg | 676 | 1684 | $60,820.00 | 1002 | $30,060.00 | 2686 | $80,580.00 | | $0.00 | 2686 | $80,580.00 |
| Totals | 2613 | 7000 | | 4616 | | 11670 | $347,100.00 | 693 | $20,790.00 | 12363 | $367,890.00 |
| Total $'s | $78,390.00 | $211,900.00 | | $138,300.00 | | | | | | | |